**THE GOOD NEWS CLUB, Andrea Fournier, and Darleen Fournier, Plaintiffs,**

v.

**MILFORD CENTRAL SCHOOL, Defendant.**

No. 97–CV–0302.

United States District Court, N.D. New York.

Oct. 23, 1998.

---

Office of Thomas Marcelle, Slingerlands, NY, Thomas Marcelle, of counsel, for Plaintiffs.

Ferrara, Fiorenza, Larrison, Barrett & Reitz, P.C., East Syracuse, NY, Frank W. Miller, of counsel, for Defendant.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

Plaintiffs Good News Club ("Good News" or the "Club"), Andrea Fournier, and Darleen Fournier brought this action pursuant to 42 U.S.C. § 1983, alleging, *inter alia*, that defendant Milford Central School ("MCS" or "defendant") violated their free speech rights under the First Amendment to the United States Constitution by denying them the use of the MCS cafeteria. On April 14, 1997, this Court preliminarily enjoined defendant from denying plaintiffs use of the cafeteria during non-school hours. Defendant now moves for summary judgment dismissing the Complaint. Plaintiffs cross-move for summary judgment on their free speech and equal protection claims.

## I. Background

### A. Facts

Good News is an unincorporated community-based Christian youth organization open to children between the ages of six and twelve. Although the Club is nondenominational, its stated purpose is to instruct children in family values and morals from a Christian perspective. The Club meets weekly for one hour and a typical meeting includes an opening prayer, singing of Christian songs, memorization, recital, and discussion of Biblical verses and scripture, and a closing prayer.

The Club is affiliated with Child Evangelism Fellowship ("CEF"), a Christian missionary organization that oversees and provides support to the Good News clubs throughout the country.[1] This support includes providing teaching materials, prayer booklets (the "Daily Bread"), and training, in return for which the Clubs pay a fee. Additionally, CEF provides "prayer support" for the instructors of the various Good News clubs. Defendant Darleen Fournier is in charge of the Club, defendant Andrea Fournier is a Good News member, and Steven Fourier, not named in the above matter, is a pastor and instructor at Good News.

The Club previously met at the Milford Center Community Bible Church where Steven Fournier was pastor. Children were transported to these meetings by either a bus provided by MCS, or privately by parents. After MCS decided to no longer provide transportation, plaintiffs sought use of MCS's facilities to hold their meetings. On September 22, 1996, plaintiffs submitted a formal request to use the MCS cafeteria from 3 p.m. to 4 p.m. to conduct its weekly meetings. On October 3, 1996, plaintiffs' request was formally denied in a letter by Superintendent Robert McGruder ("McGruder") on the grounds that the Milford Central School District (the "District") believed that the Club's activities constituted religious worship and instruction, which is prohibited under section 414 of the New York Education Law[2] and MCS policy.[3]

---

1. Tellingly, the Club's teacher, Steven Fournier defines evangelism as "introducing children to Jesus Christ," and "fellowship" as "[m]eeting downstairs in the church and having dinner." Dep. of Steven Fournier, at 48.

2. Section 414 provides for the use of schools and school grounds. It also authorizes local school boards to adopt reasonable regulations for the use of school facilities. Section 414 states that school boards may permit the use of the schoolhouse or school grounds for, *inter alia*, the following purposes:

 (a) For the purpose of instruction in any branch of education, learning or the arts.
 ***

(c) For holding social, civic and recreational meetings and entertainments, and other uses pertaining to the welfare of the community; but such meetings, entertainment and uses shall be non-exclusive and shall be open to the general public.

(d) For meetings, entertainments and occasions where admission fees are charged, when the proceeds thereof are to be expended for an educational or charitable purpose; but such use shall not be permitted if such meetings, entertainments and occasions are under the exclusive control, and the said proceeds are to be applied for the benefit of a society, association or organization of a religious sect or denomination....

3. In his October 3, 1996 letter, Superintendent McGruder stated:

Pursuant to section 414, the MCS District Board of Education adopted the "Community Use of School Facilities Policy" ("Community Use Policy") on August 26, 1992. *See* Def. Ex. 3. The Community Use Policy provides that school facilities may be used by district residents for "holding social, civic and recreational meetings and entertainment events and other uses pertaining to the welfare of the community, provided that such uses shall be nonexclusive and shall be open to the general public" and consistent with all applicable state laws. *Id.* The policy further provides that such use must be for nonreligious purposes:

> School premises shall not be used by any individual or organization for religious purposes. Those individuals and/or organizations wishing to use school facilities and/or grounds under this policy shall indicate on a Certificate Regarding Use of School Premises form provided by the District that any intended use of school premises is in accordance with this policy.

*Id.* at 1.

The Community Use Policy lists acceptable and prohibited uses for school facilities, essentially iterating the acceptable and non-acceptable uses provided in New York Education Law § 414. *See supra* note 1.

**B. Procedural History**

Plaintiffs filed their Complaint on March 7, 1997. The Complaint contains claims under 42 U.S.C. § 1983 for violations of the plaintiffs' free speech rights under the First Amendment and equal protection rights under the Fourteenth Amendment; and a claim under the Religious Freedom Restoration

[Y]our group's request to use the school facilities indicated such use would be for the purpose of 'hearing a bible lesson and memorizing scripture.' I understand such proposed use to be the equivalent of religious worship, which is prohibited under [Milford Central School District] policy, rather than the expression of religious views or values on a secular subject matter. To my knowledge, our facilities have not been used in the past by any organization for the purpose of religious worship.
Def. Ex. A, Letter of Robert McGruder, Interim Superintendent, Milford School District, dated October 3, 1996.

Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.*[4] Plaintiffs sought injunctive relief, damages, and attorneys' fees.

Plaintiffs moved for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a), restraining and enjoining defendants from enforcing a ban on plaintiffs' First Amendment right to utilize the school facilities that have, by policy and practice, been made available for public use to other organizations during non-school hours. This Court granted the motion in a bench decision rendered April 14, 1997. Citing to the holdings in *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), and *Rosenberger v. Rector and Visitors of the Univ. of Virginia,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), this Court noted

> There is no question that the defendant can limit the use of its facilities, and that it need not permit even those uses provided for in § 414 of New York Education Law. However, once it established itself as a limited forum by permitting certain categories of outside uses of its facilities, the State, in the person of the defendant, must respect the lawful boundaries it has itself set.

April 14, 1997 Bench Decision (internal citations omitted). With respect to the question of whether plaintiffs met their burden to show sufficiently serious questions going to the merits to present a fair ground for litigation, this Court ruled

> In the instant case, the central dispute relates to each sides' understanding of the plaintiff [Good News Club's] meetings. Is

4. RFRA has been declared unconstitutional by the United States Supreme Court. *See City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 2172, 138 L.Ed.2d 624 (1997). Accordingly, plaintiffs' RFRA claim is moot. *See Bronx Household of Faith v. Community Sch. Dist. No. 10,* 127 F.3d 207, 217 (2d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998).

the content religious, as alleged by the defendant? Or is the content non-religious, but presented from a religious viewpoint, as alleged by the plaintiffs? .... Clearly, this issue presents fair ground for litigation, as it can only be resolved after 'full and complete proof of the nature' of [Good News Club's] programming.

*Id.* (internal citations omitted).

Defendant now moves for summary judgment dismissing the Complaint. Plaintiffs cross-move for summary judgment on their free speech and equal protection claims.[5]

## II. DISCUSSION

### A. The Standard for Summary Judgment

The Court will now address defendant's motion for summary judgment.

The standard for summary judgment is well-settled. Under Fed.R.Civ.P. 56(c), if there is "no genuine issue as to any material fact ... the moving party is entitled to a judgment as a matter of law ... where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 86 (1996). The moving party bears the initial burden of "informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 56(c)). The initial burden is to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548.

Once the moving party has met its burden, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548; *Matsushita*,

475 U.S. at 585–86, 106 S.Ct. 1348. A dispute regarding a material fact is genuine if a reasonable jury could return a verdict for the non-moving party; that is, whether the non-movant's case, if proved at trial, would be sufficient to survive a motion for judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When reasonable minds, however, could not differ as to the import of the evidence, then summary judgment is proper. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Although the trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985) *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), the motion will not be defeated by a non-movant who raises merely a "metaphysical doubt" concerning the facts or who only offers conjecture or surmise. *Delaware & H.R. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991) (quoting *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348); *see also Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990). Indeed, the nonmoving party's opposition may not rest on mere allegations or denials of the moving party's pleading, but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e).

It is with these considerations in mind that the Court addresses defendant's motion for summary judgment.

### B. The Freedom of Speech Claim

#### 1. Nature of the Forum

 The protections afforded by the First Amendment do not guarantee unlimited access to public property. A school district, like any other property owner, may regulate

---

5. On September 28, 1998, the parties filed a Joint Stipulation to Remove the Case From the Trial Calendar pending resolution of defendant's motion and plaintiffs' cross-motion for summary judgment.

access to property under its control. *See Lamb's Chapel,* 508 U.S. at 390, 113 S.Ct. 2141; *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). In determining the extent to which the government may limit access to its property, the Supreme Court has adopted a forum analysis that balances the government's interest in· limiting the use of its property against the interests of those who wish to use the property for expressive activity. *See Cornelius,* 473 U.S. at 800, 105 S.Ct. 3439; *Travis v. Owego– Apalachin Sch. Dist.,* 927 F.2d 688, 691 (2d Cir.1991). Accordingly, the right of access to public property depends upon the character of the property at issue. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *Bronx Household,* 127 F.3d at 211 ("[F]reedom to speak on government property is largely dependent on the nature of the forum in which the speech is delivered."). To this end, the Supreme Court has characterized public property for First Amendment purposes in three ways: (1) the traditional public forum; (2) the designated or limited public forum; and (3) the nonpublic forum. *See Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439; *Bronx Household,* 127 F.3d at 211.

■ The Court's first task is to determine the nature of the forum created by the· District in MCS's facilities. This requires an examination of the state law and the school policies governing permitted uses of school facilities and whether the District previously opened its property "to entities of a similar character and for the discussion of topics of similar nature." *Travis v. Owego–Apalachin Sch. Dist.,* 1990 WL 94196, at * 6 (N.D.N.Y. July 6, 1990) (McAvoy, J.), *aff'd,* 927 F.2d 688 (2d Cir.1991).

■ Generally, courts analyze the State's intent in creating the forum in determining which type of forum exists. *See Cornelius,* 473 U.S. at 805, 105 S.Ct. 3439; *Deeper Life Christian Fellowship, Inc. v. Board of Educ. of the City of New York,* 852 F.2d 676, 680 (2d Cir.1988) ("Critical to a finding that the State has created a limited public forum is a determination of the State's intent in establishing the forum.") (citations omitted). New York Education Law § 414 evidences the intent of the legislature to create a limited public forum in its public schools by permitting use of public school buildings by the general public for specific purposes. *See* New York Educ. Law § 414 (McKinney 1988 & Supp.1998); *see also Deeper Life,* 852 F.2d at 680; *Travis,* 1990 WL 94196, at *4. Notably, religious worship, instruction, and fundraising is not among these enumerated purposes. *See Deeper Life,* 852 F.2d at 680 (citing *Trietley v. Board of Educ.,* 65 A.D.2d 1, 409 N.Y.S.2d 912, 915 (4th Dep't 1978)). Moreover, the Community Use Policy prohibits use of school facilities for "religious purposes." In denying plaintiff's request to use the school cafeteria, Superintendent McGruder stated

> [Y]our group's request to use the school facilities indicated such use would be for the purpose of 'hearing a bible lesson and memorizing scripture.' I understand such proposed use to be the equivalent of religious worship, which is prohibited under [Milford Central School District] policy, rather than the expression of religious views or values on a secular subject. To my knowledge, our facilities have not been used in the past by any organization for the purpose of religious worship.

Def. Ex. A, Letter of Robert McGruder, Interim Superintendent, Milford School District, dated October 3, 1996.

In adopting the Community Use Policy, the District carefully attempted to comply with the requirements in section 414 and the holding in *Lamb's Chapel.* Thus, "nothing in [the District's] 'official' policies evinces the intent to designate [its] facilities as limited public forums for religious purposes." *Liberty Christian Ctr. v. Board of Educ. of the City Sch. Dist. of the City of Watertown,* 8 F.Supp.2d 176, 183 (N.D.N.Y.1998) (McAvoy, C.J.). While the District's official policies tend to favor a finding of a limited public forum, the "past practice of the [District] in regard to its use of the property at issue (also) is a proper consideration" in determining the type of forum created. *Deeper Life,* 852 F.2d at 680; *see also Perry,* 460 U.S. at 47, 103 S.Ct. 948.

In the present case, the parties agree that MCS is a limited public forum. *See* Pl.Mem. of Law at 7; Def.Mem. of Law at 7–8, 12. "Limited public forums are 'created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects.'" *Bronx Household,* 127 F.3d at 211 (quoting *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439). When a state opens a forum to the general public, the state is "bound by the same standards as apply in a traditional public forum." *Perry,* 460 U.S. at 46, 103 S.Ct. 948. Accordingly, while the First Amendment permits reasonable time, place, and manner regulations, it forbids the state to enforce content-based exclusions unless narrowly drawn to serve a compelling state interest. *See id.; Travis,* 927 F.2d at 692.

The State "is not required to indefinitely retain the open character" of a limited public forum, however, *Perry,* 460 U.S. at 46, 103 S.Ct. 948, and an entity such as a school district is entitled, as is a private owner of property, to "preserve the property under its control for the use to which it is dedicated." *Lamb's Chapel,* 508 U.S. at 390, 113 S.Ct. 2141. A state may therefore designate a forum as public "but limit[ ] the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Travis,* 927 F.2d at 692; *see also Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510 ("The necessities of confining a forum to the limited and legitimate purposes for which it was created justify the State in reserving it for certain groups or for the discussion of certain topics."); *Perry,* 460 U.S. at 49, 103 S.Ct. 948 ("Implicit in the concept of the nonpublic forum is the right to make distinctions in access based on the basis of the subject matter and speaker identity."). Such content-based limitations are permissible to the extent that they preserve the purposes of the limited forum and are viewpoint neutral. *Rosenberger,* 515 U.S. at 829–30, 115 S.Ct. 2510; *Lamb's Chapel,* 508 U.S. at 393, 113 S.Ct. 2141; *Bronx Household,* 127 F.3d at 211 ("[R]estrictions on access based on speaker identity and subject matter are permissible only if 'the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'") (quoting *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439).

As to those specified uses for which such property is designated a public forum, the same First Amendment protections accorded traditional public forums apply. *See Perry,* 460 U.S. at 46, 103 S.Ct. 948; *Calash v. City of Bridgeport,* 788 F.2d 80, 82 (2d Cir.1986). In other words, constitutional protection in a limited public forum is afforded only to "expressive activity of a genre similar to those that government has admitted to the limited public forum." *Travis,* 927 F.2d at 692 ("[T]he government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre."). Therefore, to succeed, plaintiffs must establish that the District's use policies "created a limited public forum intended to benefit ... organizations such as [Good News] and encompassing the purposes for which the organization seeks to use the school property," *Deeper Life,* 852 F.2d at 680, and permitted similar organizations to use the school facilities for similar purposes. *See Bronx Household,* 127 F.3d at 214.

## 2. Reasonable and Viewpoint Neutral

Where the state has created a limited public forum by permitting access to designated groups, the First Amendment protections afforded to a traditional public forum apply and "the constitutional right of access would ... extend only to other entities of similar character." *Perry,* 460 U.S. at 48, 103 S.Ct. 948; *see also Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510 ("Once it has opened a limited forum ... the State must respect the lawful boundaries it has itself set."); *Travis,* 927 F.2d at 692 ("[C]onstitutional protection is afforded only to expressive activity of a genre similar to those that the government has admitted to the limited forum."). However, where the speech in question addresses a subject not encompassed within the purpose of the forum, it may be excluded from the forum provided it does not discriminate against speech on the basis of its viewpoint.

*See Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510; *Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439. Therefore, having identified the District's facilities as a limited public forum, the Court must determine whether denying Good News use of the school's facilities was reasonable and viewpoint neutral. *See Bronx Household*, 127 F.3d at 214; *Travis*, 927 F.2d at 692.

Plaintiffs do not object to the reasonableness of the District's policy that prohibits the use of MCS's facilities for religious purposes. *See Bronx Household*, 127 F.3d at 214 (noting that it is reasonable for a school to adopt legislation that denies groups permission to use school facilities for religious purposes). Rather, plaintiffs argue that the Club's activities are secular in nature and similar to other youth organizations, such as the Boy's Scouts, Girl's Scouts, and 4–H Club, that have been permitted to use MCS's facilities; the only difference being that Good News conveys its message "from a Christian perspective by using Bible stories, games, scripture, and religious songs." Pl. Mem. of Law at 8. Accordingly, plaintiffs contend that defendant's policies and practices have created a limited public forum open to a genre of speech that addresses "the moral development of young people." *Id.* at 7. Defendant, however, argues that the Club's activities are more appropriately classified as religious instruction and worship and are therefore outside the permitted use of the forum. Plaintiffs, in turn, challenge the defendant's characterization of the Club's activities, arguing that its use falls within the same genre as the other clubs and that defendant's denial of the Club's request constituted viewpoint discrimination, and was therefore unconstitutional. Thus, the Court is faced with two tasks: (i) defining Good News' purpose and the genre of its speech; and (ii) determining whether the District permitted groups of a similar genre to use its facilities in the past.

### i. What is the genre of Good News' activities?

Because the parties fundamentally disagree on the genre of the Club's speech, and such a characterization is central to the Court's determination, a detailed discussion of the Club's activities is warranted.

A careful analysis of the Club's activities reveals that its subject matter is decidedly religious in nature, and not merely a discussion of secular matters from a religious perspective that is otherwise permitted under the District's use policies. A typical Club meeting includes an opening prayer, singing of Christian songs, memorization and recital of Biblical verses and scripture for which the children receive prizes, a discussion based on a Bible reading, and a closing prayer. Dep. of Steven Fournier, at 78. Indeed, plaintiffs own description of the Club's activities is characteristic of a classroom-type setting with formal instruction:

> The Club opens its session with Ms. [Darleen] Fournier taking attendance. As she calls a child's name, if the child recites a Bible verse the child receives a treat. After attendance, the Club sings songs. Next Club members engage in games that involve, *inter alia,* learning Bible verses. Ms. Fournier then relates a Bible story and explains how it applies to Club members' lives. The Club closes with prayer. Finally, Ms. Fournier distributes treats and the Bible verses for memorization.

Def. Ex. D, Letter of Thomas Marcelle, dated January 17, 1997.

The Good News Club is comprised of approximately twenty children, ranging from kindergarten to junior high school students. Plaintiffs argue that the Club differs from other children's organizations in that it teaches morals and values from a Christian perspective. *See* Dep. of Steven Fournier, at 13. Steven Fournier, the Club's teacher, describes Good News' activities as "religious in nature," but distinct from religious worship. *See id.* at 67. He goes on to describe the Club's activities as

> [Of] a religious nature [in] that religion is, you know, just an acceptance of a set of standards, of a set of beliefs.... [The Club] teach[es] moral values from a Christian perspective ... [made] meaningful ... [by] the fact that you need a relation-

ship with Christ to fulfill [these values] the way God would have you fulfill them.

*Id.* at 69.

Central to this "perspective" is the children's acceptance of Jesus Christ into their lives. *See* Dep. of Steven Fournier, at 32 (defining the "Christian perspective" as "accepting Jesus Christ as their Savior"); Dep. of Darleen Fournier, at 136 ("Christian perspective is that you need the Lord Jesus to help you to be able to give you the power actually to live a moral life."). This message is conveyed to the children during their lesson:

> [B]ecause we are teaching morals from a Christian perspective, we would present that perspective, which is that these morals or these values are senseless without Christ, [that is] to the children who know Christ as Savior, we would say, you know you cannot be jealous because you know you have the strength of God. To the children who do not know Christ, we would say, *you need Christ as your Lord and Savior* so that you might overcome these, you know, feelings of jealousy or overcome the desire to do bad things to those who have somehow hurt you.

Dep. of Steven Fournier, at 34 (emphasis added).

Notably, the name of the club is derived from the Bible, "where the 'good news' [was] that Christ, according to the Scriptures, died for our sins, was buried and on the third day rose again." *Id.* at 24–25.

Each Good News Club has a teacher and formal lesson materials which are used to instruct the Club members. For example, each teacher is provided with a booklet called *The Daily Bread*[6] which is provided to the children, and contains excerpts from the Bible that are part of the reading materials used to instruct the children. *See* Dep. of Steven Fournier, at 111. An examination of one such *Daily Bread* booklet, entitled *Marantha* ("Our Lord is Coming"), is instructive of the Club's purpose. In this particular booklet, *Marantha* is the "password," and each section of the lesson conveys a message

tied to a key word or phrase found in the Bible. During this lesson, children are instructed that

> The Bible tells us how we can have our sins forgiven by receiving the Lord Jesus Christ. It tells us how to live to please Him.... If you have received the Lord Jesus as your Saviour from sin, you belong to God's special group-His family.... After the Lord Jesus grew to be a man, He told people He would die and rise again. When He was nailed to a cross where He died, many people did not understand how He could be the Saviour.... Suddenly He rose up into the air and disappeared! ... Ever since that time, those who have received the Lord Jesus have been looking for Him. Have you received Him as your Saviour? Are you looking for Him? ... There is room for every one in [Heaven] who receives the Lord Jesus as Saviour from sin. Have you received Him? Are you looking forward to moving to the Father's house in Heaven? ... How wonderful it will be to be with the Lord Jesus forever.... As you study God's Word, He will show you things He wants you to do in living your life pleasing to Him. Ask Him to show you something you can do for Him today.... If you obey God, you'll not be ashamed when the Lord Jesus comes.... Remember our mystery word ... resurrection. Just as the Lord Jesus rose again from the dead, those who believe in Him will also be raised from their graves. If you should die before the Lord Jesus comes again, your body will be placed in a grave. But when he gives the signal, your body will be raised from the grave; it will be changed into a body like that of the Lord Jesus; and you will be caught up to meet Him in the air.... You will be with Him.... Someday, if the Lord Jesus does not come ... you will die.... Our bodies will be placed in graves. When the Lord Jesus gives the signal, all the believers who have died will be raised, alive again. They will have new bodies.... Those who are still living will also be given new bodies like the body of the Lord Jesus so that we

---

**6.** This is described as a "devotional booklet" intended to provide daily "spiritual nourishment" to the children. Dep. of Steven Fournier, at 107, 108. The phrase itself "appears in the Lord's Prayer." *Id.* at 108.

may travel with Him.... Our new bodies will be just like Jesus' resurrection body.... The best thing about Heaven is that we will be with Lord Jesus forever.... Someday the Lord Jesus is going to judge all things you have done. He will decide if you have earned any rewards. The place where the Lord Jesus will do this is called the judgment seat of Christ. Every believer will have to appear before the judgment seat of Christ to give an account.... If we do what pleases the Lord Jesus, we will receive an honor.... When you tell someone of the Lord Jesus and he receives Him as Saviour from sin, both of you are made glad. If a person does not receive the Lord Jesus as Saviour, he will not be able to go to Heaven. Marantha ("Our Lord is Coming") would not be a happy saying for him.... *You can encourage other boys and girls to go to Sunday school or Good News Club.*

Def.Ex. E (Excerpts from *Daily Bread For Boys and Girls No. 8, Marantha* ) (emphasis added).

The theme of the lesson presented by the teacher is also characteristic of religious instruction. For example, concepts such as temptation, obedience, jealousy, and punishment are explained to the children by relating them to specific passages and verses in the Bible, and encouraging the children to "believe in the Lord Jesus as their Savior." Dep. of Steven Fournier at 90. The lesson materials have "symbols" in the margins that emphasize "God's solution/way," and an "invitation to receive Christ," and instruct the teacher

[To] lead a child to Christ.... Reading the verse from your Bible helps establish that it is God's Word.... Encourage children to bring their own Bibles. If many children have their Bibles, take time to help them look up their verse.... Invite children to receive the Lord Jesus.... Whenever possible, help children to feel comfortable with God's Word.... Encourage children to read a few verses from the Bible each day.... Emphasize that this verse is from the Bible, God's Word. This verse is important-and true-because God said it.... Be sure to give an opportunity

for the "unsaved" children in your class to respond to the Gospel. Don't neglect this responsibility.

Def.Ex. 8 (excerpts from teaching lessons).

During the lesson, the teacher "challenges" the "saved" children, those who already believe in the Lord Jesus as their Savior, to "[s]top and ask God for the strength and the 'want' ... to obey Him." Def.Ex. 8. The children are then instructed

[I]f you know Jesus as your Savior, you need to place God first in your life. And if you don't know Jesus as Savior and if you would like to, then we will—we will pray with you separately, individually.... And the challenge would be, those of you who know Jesus as Savior, you can rely on God's strength to obey Him.

Dep. of Steven Fournier, at 86–87; 94; *see also* Def.Ex. 8 ("Challenge" section in excerpted teaching materials).

If a child is "unsaved," the teacher "invites" the child to "to trust the Lord Jesus to be your Savior from sin" and "receive[ ][him] as your Savior from sin." Def.Ex. 8. The children are then instructed

If you believe what God's Word says about your sin and how Jesus died and rose again for you, you can have His forever life today. Please bow your heads and close your eyes. If you have never believed on the Lord Jesus as your Savior and would like to do that, please show me by raising your hand. If you raised your hand to show me you want to believe on the Lord Jesus, please meet me so I can show you from God's Word how you can receive His everlasting life.

*See* Def.Ex. 8 ("Invitation" section in excerpted teaching materials).

And then we would give an invitation that if you would like that strength to obey God and you would like to ask Jesus as your personal Lord and Savior, come up and talk with us ... and we'll pray with you.... And also the invitation would be if these children, if they don't know the Lord as their Savior, in order to overcome jealousy or to obey God or whatever value

we're speaking of, they would need to ask Jesus into their lives.

Dep. of Steven Fournier, at 90–91.

The "challenge" and "invitation" occur at various times throughout the lesson. *See id.* at 98. During the lesson, the teacher emphasizes the importance of memorizing Biblical verses by awarding the children prizes or candy for correctly reciting the assigned verse. *See* Dep. of Steven Fournier, at 25, 39. The children are taught new verses each week, and are assisted by their teacher in memorizing the verse by "play[ing] a game that helps them to remember that verse, sort of like a drill." *Id.* Additionally, the children are provided with copies of "memory verse tokens" that contain scripture verses that the children are asked to memorize for the following week's lesson. *See id.* at 102; 107. Praying is also a regular part of each Club meeting. During these prayers, the children "may at times [pray] . . . to receive Jesus as their personal Savior." *Id.* at 23. The children are also read "missionary stories" [7] that "spread the gospel" and encourage Bible study. *Id.* at 38. During these stories there are occasional references to accepting Jesus Christ as the Savior. *See id.* at 33–34. The children regularly sing songs of a religious nature that make references to God or Jesus Christ.[8] *See id.* at 34. Notably, none of the children have declined to participate in any of the Club's activities. *See id.* at 28.

The Club's activities are characteristic of formal religious instruction, structured in a classroom setting. Each Club has a teacher, uniform lesson plans, and teaching materials. *See id.* at 84–88. That the Club does not promote any one specific denomination or theology within the Christian faith does not make its activities any less religious in nature. Good News' teaching materials and lessons are oriented toward instilling Christian beliefs in the children. To this end, the children pray, read the Bible, memorize Biblical verses, and sing songs that have religious references. These activities "clearly denot[e] the organization as a religious club," designed to "instill Christian religion and values" in the children. *Good News/Good Sports Club v. School District of the City of Ladue*, 28 F.3d 1501, 1511–12 (8th Cir.1994) (Bright, J., dissenting), *cert. denied*, 515 U.S. 1173, 115 S.Ct. 2640, 132 L.Ed.2d 878 (1995). The emphasis on prayer, memorization, and recitation of Biblical verses and scripture, and singing of religious songs also are characteristic of worship activities that inculcate Christian religion and values in the children. *See Bronx Household*, 127 F.3d at 215 (plaintiff describes its proposed church worship services to include "hymn singing . . . Bible reading, Bible preaching, and teaching").

The purpose of Good News is to "pass along Christian faith and morality to the student members of the Club." *Good News/Good Sports Club v. School District of City of Ladue*, 859 F.Supp. 1239, 1248 (E.D.Mo. 1993), *rev'd*, 28 F.3d 1501 (8th Cir.1994), *cert. denied*, 515 U.S. 1173, 115 S.Ct. 2640, 132 L.Ed.2d 878 (1995). The common theme emphasized in each lesson is the importance of having "a relationship with Christ." Dep. of Steven Fournier, at 69. Specifically, the children are "invited" to accept Jesus Christ in their lives or "challenged" to follow God's Word if they already believe in Jesus Christ as their Savior. *See id.* at 96–100. Accord-

---

7. Although this phrase is not clearly defined by the parties, the stories discuss "some part of the world where missionary activity is going on." Dep. of Steven Fournier, at 26. Therefore, these stories likely deal with "person[s] sent by a church . . . into a newly settled region . . . to carry on evangelism." THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 917 (1979).

Notably, Steven Fournier, the Club's teacher, and pastor of the Milford Center Community Bible Church, is a "village missionary" who provides "full-time pastoral leadership to small churches in rural area." *Id.* at 8–9. Prior to his current position, Mr. Fournier was pastor of Montville Union Baptist Church. *See id.* at 8.

8. For example, the lyrics to one song, "You and Me," are

You and me-you and me, Jesus dies on the cross for you and me. You and me-you and me, Jesus rose from the dead for you and me. You and me-you and me, He is coming back for you and me.

Def.Ex. 8 (excerpted from Club teaching materials).

In other lyrics to Club songs, the children are told

He is Lord . . . He is risen from the dead and He is Lord. Every knee shall bow, every tongue confess, that Jesus Christ is Lord.

*Id.*

ingly, the Club uses formal religious instruction and prayer to "instill and reinforce Christian faith" in the children. *Good News/ Good Sports Club*, 859 F.Supp. at 1248.

Having defined the genre of Good News' activities as religious instruction, the Court must now examine whether MCS permitted similar organizations of a similar genre to use the school's facilities in the past.

### ii. Did the District permit prior use by groups of a similar genre?

 The 1992 Community Use Policy created a limited public forum in the District's school facilities. In this regard, the District adopted a neutral policy toward all community groups that does not permit the use of school facilities for religious purposes. The policy is not anti-religious; it is intended to prohibit all outside groups from using District facilities for religious purposes. As previously noted, "religious purposes" is not included in the enumerated purposes for which a school may be used under N.Y. State Education Law § 414. *See Trietley*, 409 N.Y.S.2d at 915. The Second Circuit has held this construction of the statute as binding "in the absence of 'other persuasive data that the highest court of the state would decide otherwise.'" *Deeper Life Christian Fellowship, Inc. v. Sobol*, 948 F.2d 79, 83–84 (2d Cir.1991). "The provision of religious worship, instruction, and fundraising is not among [the enumerated] purposes." *Deeper Life*, 852 F.2d at 680; *see also Bronx Household*, 127 F.3d at 210 (dealing with school policy where "[n]o outside organization or group may be allowed to conduct religious services or religious instruction on school premises after school."). This was the same view adopted by MCS. *See* Dep. of Peter Livshin, Superintendent of Milford Central School, at 7 ("I would interpret [religious purposes] to mean conducting religious services, providing religious instruction or to an extreme, religious indoctrination into a philosophy or a belief."); *see also* Def.Ex. A, Letter of Robert McGruder, Interim Superintendent of Milford Central School. The District's policy of denying the use of school facilities for "religious purposes" encompasses religious instruction and prayer in its pro-

hibition. *Accord Deeper Life*, 852 F.2d at 680. Therefore, Good News' proposed use was not for purposes otherwise permitted under the District's Community Use Policy. *See Lamb's Chapel*, 508 U.S. at 393–94, 113 S.Ct. 2141. Furthermore, plaintiffs have not argued nor presented any evidence that the District previously permitted the use of its facilities for religious purposes. *Cf. Bronx Household*, 127 F.3d at 214. Rather, plaintiffs contend that, because access to MCS's facilities was granted to the Boy Scouts, Girl Scouts, and 4–H Club, Good News must be granted similar access because it deals with the same subject matter—teaching children moral values, but from a different viewpoint—the Christian perspective.

A comparison of the activities between Good News and the Boys Scouts, Girl Scouts, and 4–H Club, reveals that Good News' activities constitute religious instruction that is conceptually of a different genre than the secular subject matter dealt with by these other clubs. In failing to make this distinction, plaintiffs misunderstand that while a limited forum may be open to certain groups, it may be permissibly closed to other groups whose activities focus on a different subject matter. *See Perry*, 460 U.S. at 48, 103 S.Ct. 948 ("While the school mail facilities thus might be a forum generally open for use by the Girl Scouts, the local boys' club and other organizations that engage in activities of interest and educational relevance to students, they would not as a consequence be open to an organization such as [Perry Local Educators' Association], which is concerned with the terms and conditions of teacher employment."). An examination of the Boy Scouts, Girl Scouts, and 4–H Club supports this conclusion.

The Boy Scouts is designed to provide "effective character, citizenship, and personal fitness training" for children. Def.Ex. 4 (excerpt from Boy Scouts Web Site). Through a merit system, they encourage children to be "physically, mentally, and emotionally fit"; "a high degree of self reliance"; and to "understand the principles of the American social, economic, and governmental systems." *Id.* To accomplish these goals, the Boy Scouts "focus[es] on a vigorous program of

outdoor activities" where "Scouts share responsibilities and learn to live with one another" and "learn ecology and practice conservation of nature's resources." *Id.* While the Boy Scouts teach reverence and a duty to God, it is only a part of its overall purpose which is the personal growth and development of leadership skills. *See Good News/ Good Sports Club,* 859 F.Supp. at 1248 ("Any incidental reference to God ... does not convert the secular nature of the [Boy] Scouts into a religious nature.").

The purpose of the Girl Scouts "is to inspire girls with the highest ideals of character, conduct, patriotism, and service [so] that they may become happy and resourceful citizens." Def.Ex. 5 (excerpt from Girl Scout Web Site). The Girl Scouts are "[b]ased on ethical values ... working in partnership with adult volunteers. Its sole purpose is to meet the special needs of girls." *Id.* The 4–H Club is a youth organization whose purpose is to "enable youth to develop knowledge, skills, abilities, attitudes, and behaviors to be competent, caring adults." Def.Ex. 6 (excerpts from Cornell University Cooperative Extension 4–H Youth Development system). Similar to the Boy and Girl Scouts, the 4–H Club strives to develop leadership and volunteer skills in the children and values cultural diversity in its membership.

The Club's teacher, Steven Fournier, acknowledged that the Boy and Girl Scouts do not instruct children in religious subjects. *See* Dep. of Steven Fournier, at 116. Although the Boy Scout members are awarded a badge for "God and Country," the instruction and activities necessary to receive the badge are performed outside the scout meetings, privately by the child and his family. *See Good News/Good Sports Club,* 859 F.Supp. at 1247; *see also* Dep. of Steven Fournier, at 114–15.

The Court finds instructive the findings of the district court in *Good News/Good Sports Club,* in which the district court, following a bench trial, returned a judgment in favor of the defendant. Specifically, the district court found

The evidence presented at trial supports a finding that the [Girl, Boy, Cub, Tiger Cub, and Brownies] Scouts are primarily a secular organization engaging in secular activities. The purpose of Scout meetings is for the young persons involved to have fun, to support the ideals of Scouting, education, and reinforcement of moral values. Although Scouts may earn religious badges, those badges are earned at home or in the scout's place of worship.

Scouting activities include camping, woodworking, swimming, non-religious games, and other secular, skill-oriented activity. Other than the single reference to God in the Scout oath, all activity at Scout meetings is of a secular nature.... The descriptions of the purpose of Scouting do not include any reference to God or to religion.

The [Good News] Club, by contrast, was initiated to teach the young members Christian values. Each parent who testified at trial testified to the importance of the religious aspect of the Club and that a purpose of the Club was to pass along Christian faith and morality to the student members of the Club. A typical Club meeting consists of an opening prayer, snack, activity, Bible lesson, and closing prayer. Plaintiff ... testified in his deposition that he liked the Club because it gave him the opportunity to relate to Christian friends and that it was important to keep the Club going so that others might become Christian.

859 F.Supp. at 1247–48 (citations omitted).

The district court then distinguished the respective nature of the childrens' organizations as follows:

Although both the [Good News] Club and the Scouting program are concerned with the moral development of youth, the Club is fundamentally a Christian organization, the primary purpose of which is to instill and reinforce Christian faith and values in its members. The Scouts, by contrast, are a secular organization, the primary purpose of which is to develop skills and moral character not related to any religious faith. Any incidental reference to God or the "Great Master" does not convert the secular nature of the Scouts into a religious nature. The Court, therefore, finds that

the [Good News] Club and the Scouts are not of similar nature.

*Id.* at 1248 (citations omitted). This Court agrees that Good News, as a religious club, is not similarly situated with these other children's organizations that are primarily secular in nature. *See Trinity United Methodist Parish v. Board of Educ. of City of New York,* 907 F.Supp. 707, 714 (S.D.N.Y.1995); *Good News/Good Sports Club,* 859 F.Supp. at 1248.

Plaintiffs rely heavily on the Supreme Court's holding in *Lamb's Chapel* to argue that the District's denial of the Club's request to hold their meetings at MCS constituted viewpoint discrimination. However, the facts in *Lamb's Chapel* are distinguishable from the present case. *Accord Good News/Good Sports Club,* 28 F.3d at 1511 (Bright, J., dissenting).

In *Lamb's Chapel,* the Supreme Court held that a church was impermissibly denied access to school facilities to present "a film series dealing with family and child-rearing issues faced by parents today." *Lamb's Chapel,* 508 U.S. at 387, 113 S.Ct. 2141. The film series discussed the views of a licensed psychologist and clinical professor of pediatrics on "the undermining influences of the media that could be counterbalanced by returning to traditional Christian family values." [9] *Id.* at 388, 113 S.Ct. 2141. In holding that plaintiff was impermissibly denied use of the school district's facilities, the Court noted

> [T]he critical question [is] whether it discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and child rearing except those dealing with the subject matter from a religious standpoint.

*Id.* at 393, 113 S.Ct. 2141.

The Court then held

> The film series involved here no doubt dealt with a subject otherwise permissible under [the school use policies] and its exhibition was denied solely because the series dealt with the subject from a religious standpoint.

*Id.* at 394, 113 S.Ct. 2141.

Here, in contrast, Good News is a religious youth organization whose proposed use deals specifically with religious subject matter—and not, as plaintiffs contend, merely a religious perspective on secular subject matter. Thus, Good News' proposed use and religious subject matter place it in a different genre than the Boy Scouts, Girl Scouts, and 4-H Club. There is considerable difference between the formal religious instruction and prayer offered by Good News and a film series which focuses on strengthening family relationships. While the Club is concerned with developing the moral values of its members, the dominant theme of a Good News meeting is religious instruction and prayer. Thus, the Club's proposed use is not sufficiently similar to the prior uses of MCS's facilities permitted by the District. The District's prohibition was based on the general subject matter—religious instruction and prayer, and not on a particular perspective or viewpoint on a subject otherwise within the forum's limitations. *See Rosenberger,* 515 U.S. at 830, 115 S.Ct. 2510; *Church on the Rock v. City of Albuquerque,* 84 F.3d 1273, 1279 (10th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 360, 136 L.Ed.2d 251 (1996). Accordingly, the District's denial of Good News' request to use MCS's facilities was consistent with its prior practice and use and thus constitutionally sound. Because the Court finds that defendant has not violated the plaintiffs' First Amendment right of free speech, it need not consider whether the defendant's actions were necessary to comply with the constitutional prohibition against state establishment of religion. *See Rosenberger,* 115 S.Ct. at 2520; *Church on the Rock,* 84 F.3d at 1280.

## C. The Equal Protection Claim

Under the Equal Protection Clause, "a governmental entity may not 'leg-

---

**9.** The series presented six films titled, "A Father Looks Back"; "Power in Parenting: The Young Child"; "Power in Parenting: The Adolescent"; "The Family Under Fire"; "Overcoming a Painful Childhood"; and "The Heritage." *Lamb's Chapel,* 508 U.S. at 389 n. 3, 113 S.Ct. 2141. These films examine the family unit and the use of traditional values to strengthen parent-child relationships. *See id.*

islate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute.... [A]ll persons similarly circumstanced shall be treated alike.'" *Trinity United Methodist Parish,* 907 F.Supp. at 719 (quoting *Reed v. Reed,* 404 U.S. 71, 75–76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (citations omitted)). However, "[t]here is no fundamental right of freedom of speech in a limited forum from which various types of speakers and subjects are properly excluded." *Bronx Household,* 127 F.3d at 217.

In the present case, the District has permissibly made a distinction between clubs whose purpose and subject matter are substantially dissimilar in nature. The District's Community Use Policy is consistent with New York Education Law § 414, and recognizes that it may properly exclude clubs with a religious purpose provided such exclusion is reasonable and viewpoint neutral. *See Lamb's Chapel,* 508 U.S. at 393, 113 S.Ct. 2141. As previously discussed, Good News conducts religious instruction and prayer. The Club has a religious purpose—evidenced by its focus on memorization and recital of Biblical verses, singing of religious songs, Bible reading, and prayer. This places the Club in a different genre than the Boy Scouts, Girl Scouts, and 4–H Club. Accordingly, the District's Community Use Policy as applied, did not deny the plaintiffs equal protection of the law. *Accord Trinity United Methodist Parish,* 907 F.Supp. at 719.

### III. CONCLUSION:

For all of the foregoing reasons, it is hereby **ORDERED,** that the preliminary injunction is **VACATED,** and it is further **ORDERED,** that defendant's motion for summary judgment seeking to dismiss the Complaint is **GRANTED,** and it is further

**ORDERED,** that plaintiffs' cross-motion for summary judgment is **DENIED.**

**IT IS SO ORDERED.**