# GOOD NEWS CLUB ET AL. *v.* MILFORD CENTRAL SCHOOL

No. 99–2036.   Argued February 28, 2001—Decided June 11, 2001

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and KENNEDY, JJ., joined, and in which BREYER, JJ., joined in part. SCALIA, J., filed a concurring opinion, *post*, p. 120. BREYER, J., filed an opinion concurring in part, *post*, p. 127. STEVENS, J., filed a dissenting opinion, *post*, p. 130. SOUTER, J., filed a dissenting opinion, in which GINSBURG, J., joined, *post*, p. 134.

*Thomas Marcelle* argued the cause for petitioners. With him on the briefs were *John W. Whitehead* and *Steven H. Aden.*

*Frank W. Miller* argued the cause for respondent. With him on the brief were *Benjamin J. Ferrara* and *Norman H. Gross.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Alabama et al. by *Bill Pryor,* Attorney General of Alabama, *Margaret L. Fleming, John J. Park, Jr.,* and *Charles B. Campbell,* Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Thomas J. Miller* of Iowa, *Richard P. Ieyoub* of Louisiana, *Mike Moore* of Mississippi, *Don Stenberg* of Nebraska, *Betty D. Montgomery* of Ohio, *Charles M. Condon* of South Carolina, *Paul G. Summers* of Tennessee, *John Cornyn* of Texas, *Jan Graham* of Utah, and *Mark L. Earley* of Virginia; for the American Center for Law & Justice et al. by *Jay Alan Sekulow, Colby M. May, James M. Henderson, Sr., Walter M. Weber, Paul D. Clement,* and *Jeffrey S. Bucholtz;* for Child Evangelism Fellowship, Inc., et al. by *Herbert G. Grey, Darren C. Walker, Gregory S. Baylor,* and *Kimberlee Wood Colby;* for the Christian Legal Society et al. by *Carl H. Esbeck* and *Nathan J. Diament;* for the Liberty Legal Institute by *Viet D. Dinh, John L. Carter,* and *Kelly Shackelford;* for the National Council of Churches et al. by *Carter G. Phillips, Gene C. Schaerr,* and *Nicholas P. Miller;* for the National Jewish Commission on Law and Public Affairs by *Nathan Lewin, Dennis Rapps,* and *David Zwiebel;* for the Northstar Legal Center et al. by *Jordan W. Lorence* and *Joseph Infranco;* for the Solidarity Center for Law and Justice, P. C., by *James P. Kelly III;* for Wallbuilders, Inc., by *Barry C. Hodge;* for Sally Campbell by *Brett M. Kavanaugh* and *Stuart J. Roth;* for Carol Hood by *Kevin J. Hasson, Eric W. Treene, Roman P. Storzer,* and *Anthony R. Picarello, Jr.;* for Douglas Laycock by *Mr. Laycock, pro se;* and for 20 Theologians and Scholars of Religion by *Michael W. McConnell* and *Steffen N. Johnson.*

Briefs of *amici curiae* urging affirmance were filed for the American Jewish Congress by *Mark D. Stern;* for Americans United for Separation

JUSTICE THOMAS delivered the opinion of the Court.

This case presents two questions. The first question is whether Milford Central School violated the free speech rights of the Good News Club when it excluded the Club from meeting after hours at the school. The second question is whether any such violation is justified by Milford's concern that permitting the Club's activities would violate the Establishment Clause. We conclude that Milford's restriction violates the Club's free speech rights and that no Establishment Clause concern justifies that violation.

I

The State of New York authorizes local school boards to adopt regulations governing the use of their school facilities. In particular, N. Y. Educ. Law § 414 (McKinney 2000) enumerates several purposes for which local boards may open their schools to public use. In 1992, respondent Milford Central School (Milford) enacted a community use policy adopting seven of § 414's purposes for which its building could be used after school. App. to Pet. for Cert. D1–D3. Two of the stated purposes are relevant here. First, district residents may use the school for "instruction in any branch of education, learning or the arts." *Id.*, at D1. Second, the school is available for "social, civic and recreational meetings and entertainment events, and other uses pertaining to the welfare of the community, provided that such uses shall be nonexclusive and shall be opened to the general public." *Ibid.*

of Church and State et al. by *Ayesha N. Khan, Steven K. Green, Steven R. Shapiro, Jerome J. Shestack, Jeffrey P. Sinensky, Eddie Tabash, Arthur N. Eisenberg,* and *Judith E. Schaeffer;* for the Anti-Defamation League et al. by *Jeffrey R. Babbin, David B. Isbell, Martin E. Karlinsky,* and *Steven M. Freeman;* for the National School Boards Association et al. by *Julie K. Underwood;* and for the New York State School Boards Association, Inc., by *Jay Worona, Pilar Sokol,* and *John A. Miller.*

Stephen and Darleen Fournier reside within Milford's district and therefore are eligible to use the school's facilities as long as their proposed use is approved by the school. Together they are sponsors of the local Good News Club, a private Christian organization for children ages 6 to 12. Pursuant to Milford's policy, in September 1996 the Fourniers submitted a request to Dr. Robert McGruder, interim superintendent of the district, in which they sought permission to hold the Club's weekly afterschool meetings in the school cafeteria. App. in No. 98–9494 (CA2), p. A–81. The next month, McGruder formally denied the Fourniers' request on the ground that the proposed use—to have "a fun time of singing songs, hearing a Bible lesson and memorizing scripture," *ibid.*—was "the equivalent of religious worship." App. H1–H2. According to McGruder, the community use policy, which prohibits use "by any individual or organization for religious purposes," foreclosed the Club's activities. App. to Pet. for Cert. D2.

In response to a letter submitted by the Club's counsel, Milford's attorney requested information to clarify the nature of the Club's activities. The Club sent a set of materials used or distributed at the meetings and the following description of its meeting:

> "The Club opens its session with Ms. Fournier taking attendance. As she calls a child's name, if the child recites a Bible verse the child receives a treat. After attendance, the Club sings songs. Next Club members engage in games that involve, *inter alia*, learning Bible verses. Ms. Fournier then relates a Bible story and explains how it applies to Club members' lives. The Club closes with prayer. Finally, Ms. Fournier distributes treats and the Bible verses for memorization." App. in No. 98–9494 (CA2), at A–30.

McGruder and Milford's attorney reviewed the materials and concluded that "the kinds of activities proposed to be

engaged in by the Good News Club were not a discussion of secular subjects such as child rearing, development of character and development of morals from a religious perspective, but were in fact the equivalent of religious instruction itself." *Id.*, at A–25. In February 1997, the Milford Board of Education adopted a resolution rejecting the Club's request to use Milford's facilities "for the purpose of conducting religious instruction and Bible study." *Id.*, at A–56.

In March 1997, petitioners, the Good News Club, Ms. Fournier, and her daughter Andrea Fournier (collectively, the Club), filed an action under Rev. Stat. § 1979, 42 U. S. C. § 1983, against Milford in the United States District Court for the Northern District of New York. The Club alleged that Milford's denial of its application violated its free speech rights under the First and Fourteenth Amendments, its right to equal protection under the Fourteenth Amendment, and its right to religious freedom under the Religious Freedom Restoration Act of 1993, 107 Stat. 1488, 42 U. S. C. § 2000bb *et seq.*[1]

The Club moved for a preliminary injunction to prevent the school from enforcing its religious exclusion policy against the Club and thereby to permit the Club's use of the school facilities. On April 14, 1997, the District Court granted the injunction. The Club then held its weekly afterschool meetings from April 1997 until June 1998 in a high school resource and middle school special education room. App. N12.

In August 1998, the District Court vacated the preliminary injunction and granted Milford's motion for summary judgment. 21 F. Supp. 2d 147 (NDNY 1998). The court found that the Club's "subject matter is decidedly religious in nature, and not merely a discussion of secular matters

---

[1] The District Court dismissed the Club's claim under the Religious Freedom Restoration Act because we held the Act to be unconstitutional in *City of Boerne* v. *Flores*, 521 U. S. 507 (1997). See 21 F. Supp. 2d 147, 150, n. 4 (NDNY 1998).

from a religious perspective that is otherwise permitted under [Milford's] use policies." *Id.*, at 154. Because the school had not permitted other groups that provided religious instruction to use its limited public forum, the court held that the school could deny access to the Club without engaging in unconstitutional viewpoint discrimination. The court also rejected the Club's equal protection claim.

The Club appealed, and a divided panel of the United States Court of Appeals for the Second Circuit affirmed. 202 F. 3d 502 (2000). First, the court rejected the Club's contention that Milford's restriction against allowing religious instruction in its facilities is unreasonable. Second, it held that, because the subject matter of the Club's activities is "quintessentially religious," *id.*, at 510, and the activities "fall outside the bounds of pure 'moral and character development,'" *id.*, at 511, Milford's policy of excluding the Club's meetings was constitutional subject discrimination, not unconstitutional viewpoint discrimination. Judge Jacobs filed a dissenting opinion in which he concluded that the school's restriction did constitute viewpoint discrimination under *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384 (1993).

There is a conflict among the Courts of Appeals on the question whether speech can be excluded from a limited public forum on the basis of the religious nature of the speech. Compare *Gentala* v. *Tucson*, 244 F. 3d 1065 (CA9 2001) (en banc) (holding that a city properly refused National Day of Prayer organizers' application to the city's civic events fund for coverage of costs for city services); *Campbell* v. *St. Tammany's School Bd.*, 206 F. 3d 482 (CA5 2000) (holding that a school's policy against permitting religious instruction in its limited public forum did not constitute viewpoint discrimination), cert. pending, No. 00–1194* *Bronx Household of Faith* v. *Community School Dist. No. 10*, 127 F. 3d 207 (CA2 1997) (concluding that a ban on religious services and

instruction in the limited public forum was constitutional), with *Church on the Rock* v. *Albuquerque*, 84 F. 3d 1273 (CA10 1996) (holding that a city's denial of permission to show the film Jesus in a senior center was unconstitutional viewpoint discrimination); and *Good News/Good Sports Club* v. *School Dist. of Ladue*, 28 F. 3d 1501 (CA8 1994) (holding unconstitutional a school use policy that prohibited Good News Club from meeting during times when the Boy Scouts could meet). We granted certiorari to resolve this conflict. 531 U. S. 923 (2000).

## II

The standards that we apply to determine whether a State has unconstitutionally excluded a private speaker from use of a public forum depend on the nature of the forum. See *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 44 (1983). If the forum is a traditional or open public forum, the State's restrictions on speech are subject to stricter scrutiny than are restrictions in a limited public forum. *Id.*, at 45–46. We have previously declined to decide whether a school district's opening of its facilities pursuant to N. Y. Educ. Law § 414 creates a limited or a traditional public forum. See *Lamb's Chapel, supra,* at 391–392. Because the parties have agreed that Milford created a limited public forum when it opened its facilities in 1992, see Brief for Petitioners 15–17; Brief for Respondent 26, we need not resolve the issue here. Instead, we simply will assume that Milford operates a limited public forum.

When the State establishes a limited public forum, the State is not required to and does not allow persons to engage in every type of speech. The State may be justified "in reserving [its forum] for certain groups or for the discussion of certain topics." *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829 (1995); see also *Lamb's Chapel, supra,* at 392–393. The State's power to restrict speech, however, is not without limits. The restriction must not discriminate against speech on the basis of viewpoint,

*Rosenberger, supra,* at 829, and the restriction must be "reasonable in light of the purpose served by the forum," *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.,* 473 U.S. 788, 806 (1985).

## III

Applying this test, we first address whether the exclusion constituted viewpoint discrimination. We are guided in our analysis by two of our prior opinions, *Lamb's Chapel* and *Rosenberger.* In *Lamb's Chapel,* we held that a school district violated the Free Speech Clause of the First Amendment when it excluded a private group from presenting films at the school based solely on the films' discussions of family values from a religious perspective. Likewise, in *Rosenberger,* we held that a university's refusal to fund a student publication because the publication addressed issues from a religious perspective violated the Free Speech Clause. Concluding that Milford's exclusion of the Good News Club based on its religious nature is indistinguishable from the exclusions in these cases, we hold that the exclusion constitutes viewpoint discrimination. Because the restriction is viewpoint discriminatory, we need not decide whether it is unreasonable in light of the purposes served by the forum.[2]

---

[2] Although Milford argued below that, under § 414, it could not permit its property to be used for the purpose of religious activity, see Brief for Appellee in No. 98–9494 (CA2), p. 12, here it merely asserts in one sentence that it has, "in accordance with state law, closed [its] limited open forum to purely religious instruction and services," Brief for Respondent 27. Because Milford does not elaborate, it is difficult to discern whether it is arguing that it is required by state law to exclude the Club's activities.

Before the Court of Appeals, Milford cited *Trietley* v. *Board of Ed. of Buffalo,* 65 App. Div. 2d 1, 409 N. Y. S. 2d 912 (1978), in which a New York court held that a local school district could not permit a student Bible club to meet on school property because "[r]eligious purposes are not included in the enumerated purposes for which a school may be used under section 414 of the Education Law." *Id.,* at 5–6, 409 N. Y. S. 2d,

Milford has opened its limited public forum to activities that serve a variety of purposes, including events "pertaining to the welfare of the community." App. to Pet. for Cert. D1. Milford interprets its policy to permit discussions of subjects such as child rearing, and of "the development of character and morals from a religious perspective." Brief for Appellee in No. 98–9494 (CA2), p. 6. For example, this policy would allow someone to use Aesop's Fables to teach children moral values. App. N11. Additionally, a group could sponsor a debate on whether there should be a constitutional amendment to permit prayer in public schools, id., at N6, and the Boy Scouts could meet "to influence a boy's character, development and spiritual growth," id., at N10–N11. In short, any group that "promote[s] the moral and character development of children" is eligible to use the school building. Brief for Appellee in No. 98–9494 (CA2), at 9.

Just as there is no question that teaching morals and character development to children is a permissible purpose under Milford's policy, it is clear that the Club teaches morals and character development to children. For example, no one disputes that the Club instructs children to overcome feelings of jealousy, to treat others well regardless of how they treat the children, and to be obedient, even if it does so in a nonsecular way. Nonetheless, because Milford found the Club's activities to be religious in nature— "the equivalent of religious instruction itself," 202 F. 3d, at 507—it excluded the Club from use of its facilities.

---

at 915. Although the court conceded that the Bible clubs might provide incidental secular benefits, it nonetheless concluded that the school would have violated the Establishment Clause had it permitted the club's activities on campus. Because we hold that the exclusion of the Club on the basis of its religious perspective constitutes unconstitutional viewpoint discrimination, it is no defense for Milford that purely religious purposes can be excluded under state law.

Applying *Lamb's Chapel*,[3] we find it quite clear that Milford engaged in viewpoint discrimination when it excluded the Club from the afterschool forum. In *Lamb's Chapel*, the local New York school district similarly had adopted § 414's "social, civic or recreational use" category as a permitted use in its limited public forum. The district also prohibited use "by any group for religious purposes." 508 U. S., at 387. Citing this prohibition, the school district excluded a church that wanted to present films teaching family values from a Christian perspective. We held that, because the films "no doubt dealt with a subject otherwise permissible" under the rule, the teaching of family values, the district's exclusion of the church was unconstitutional viewpoint discrimination. *Id.*, at 394.

Like the church in *Lamb's Chapel*, the Club seeks to address a subject otherwise permitted under the rule, the teaching of morals and character, from a religious standpoint. Certainly, one could have characterized the film presentations in *Lamb's Chapel* as a religious use, as the Court of Appeals did, *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 959 F. 2d 381, 388–389 (CA2 1992). And one easily could conclude that the films' purpose to instruct that "'society's slide toward humanism . . . can only be counterbalanced by a loving home where Christian values are instilled from an early age,'" *id.*, at 384, was "quintessentially religious," 202 F. 3d, at 510. The only apparent dif-

---

[3] We find it remarkable that the Court of Appeals majority did not cite *Lamb's Chapel*, despite its obvious relevance to the case. We do not necessarily expect a court of appeals to catalog every opinion that reverses one of its precedents. Nonetheless, this oversight is particularly incredible because the majority's attention was directed to it at every turn. See, *e. g.*, 202 F. 3d 502, 513 (CA2 2000) (Jacobs, J., dissenting) ("I cannot square the majority's analysis in this case with *Lamb's Chapel*"); 21 F. Supp. 2d, at 150; App. 09–011 (District Court stating "that *Lamb's Chapel* and *Rosenberger* pinpoint the critical issue in this case"); Brief for Appellee in No. 98–9494 (CA2), at 36–39; Brief for Appellants in No. 98–9494 (CA2), pp. 15, 36.

ference between the activity of Lamb's Chapel and the activities of the Good News Club is that the Club chooses to teach moral lessons from a Christian perspective through live storytelling and prayer, whereas Lamb's Chapel taught lessons through films. This distinction is inconsequential. Both modes of speech use a religious viewpoint. Thus, the exclusion of the Good News Club's activities, like the exclusion of Lamb's Chapel's films, constitutes unconstitutional viewpoint discrimination.

Our opinion in *Rosenberger* also is dispositive. In *Rosenberger*, a student organization at the University of Virginia was denied funding for printing expenses because its publication, Wide Awake, offered a Christian viewpoint. Just as the Club emphasizes the role of Christianity in students' morals and character, Wide Awake " 'challenge[d] Christians to live, in word and deed, according to the faith they proclaim and . . . encourage[d] students to consider what a personal relationship with Jesus Christ means.'" ' 515 U. S., at 826. Because the university "select[ed] for disfavored treatment those student journalistic efforts with religious editorial viewpoints," we held that the denial of funding was unconstitutional. *Id.*, at 831. Although in *Rosenberger* there was no prohibition on religion as a subject matter, our holding did not rely on this factor. Instead, we concluded simply that the university's denial of funding to print Wide Awake was viewpoint discrimination, just as the school district's refusal to allow Lamb's Chapel to show its films was viewpoint discrimination. *Ibid.* Given the obvious religious content of Wide Awake, we cannot say that the Club's activities are any more "religious" or deserve any less First Amendment protection than did the publication of Wide Awake in *Rosenberger.*

Despite our holdings in *Lamb's Chapel* and *Rosenberger,* the Court of Appeals, like Milford, believed that its characterization of the Club's activities as religious in nature

warranted treating the Club's activities as different in kind from the other activities permitted by the school. See 202 F. 3d, at 510 (the Club "is doing something other than simply teaching moral values"). The "Christian viewpoint" is unique, according to the court, because it contains an "additional layer" that other kinds of viewpoints do not. *Id.*, at 509. That is, the Club "is focused on teaching children how to cultivate their relationship with God through Jesus Christ," which it characterized as "quintessentially religious." *Id.*, at 510. With these observations, the court concluded that, because the Club's activities "fall outside the bounds of pure 'moral and character development,'" the exclusion did not constitute viewpoint discrimination. *Id.*, at 511.

We disagree that something that is "quintessentially religious" or "decidedly religious in nature" cannot also be characterized properly as the teaching of morals and character development from a particular viewpoint. See 202 F. 3d, at 512 (Jacobs, J., dissenting) ("[W]hen the subject matter is morals and character, it is quixotic to attempt a distinction between religious viewpoints and religious subject matters"). What matters for purposes of the Free Speech Clause is that we can see no logical difference in kind between the invocation of Christianity by the Club and the invocation of teamwork, loyalty, or patriotism by other associations to provide a foundation for their lessons. It is apparent that the unstated principle of the Court of Appeals' reasoning is its conclusion that any time religious instruction and prayer are used to discuss morals and character, the discussion is simply not a "pure" discussion of those issues. According to the Court of Appeals, reliance on Christian principles taints moral and character instruction in a way that other foundations for thought or viewpoints do not. We, however, have never reached such a conclusion. Instead, we reaffirm our holdings in *Lamb's Chapel* and *Rosen-*

*berger* that speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint. Thus, we conclude that Milford's exclusion of the Club from use of the school, pursuant to its community use policy, constitutes impermissible viewpoint discrimination.[4]

## IV

Milford argues that, even if its restriction constitutes viewpoint discrimination, its interest in not violating the Establishment Clause outweighs the Club's interest in gaining equal access to the school's facilities. In other words, according to Milford, its restriction was required to avoid violating the Establishment Clause. We disagree.

We have said that a state interest in avoiding an Establishment Clause violation "may be characterized as compelling," and therefore may justify content-based discrimination.

---

[4] Despite Milford's insistence that the Club's activities constitute "religious worship," the Court of Appeals made no such determination. It did compare the Club's activities to "religious worship," 202 F. 3d, at 510, but ultimately it concluded merely that the Club's activities "fall outside the bounds of pure 'moral and character development,'" *id.*, at 511. In any event, we conclude that the Club's activities do not constitute mere religious worship, divorced from any teaching of moral values.

JUSTICE SOUTER's recitation of the Club's activities is accurate. See *post*, at 137–138 (dissenting opinion). But in our view, religion is used by the Club in the same fashion that it was used by Lamb's Chapel and by the students in *Rosenberger:* Religion is the viewpoint from which ideas are conveyed. We did not find the *Rosenberger* students' attempt to cultivate a personal relationship with Christ to bar their claim that religion was a viewpoint. And we see no reason to treat the Club's use of religion as something other than a viewpoint merely because of any evangelical message it conveys. According to JUSTICE SOUTER, the Club's activities constitute "an evangelical service of worship." *Post*, at 138. Regardless of the label JUSTICE SOUTER wishes to use, what matters is the substance of the Club's activities, which we conclude are materially indistinguishable from the activities in *Lamb's Chapel* and *Rosenberger.*

*Widmar* v. *Vincent,* 454 U. S. 263, 271 (1981). However, it is not clear whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination. See *Lamb's Chapel,* 508 U. S., at 394–395 (noting the suggestion in *Widmar* but ultimately not finding an Establishment Clause problem). We need not, however, confront the issue in this case, because we conclude that the school has no valid Establishment Clause interest.

We rejected Establishment Clause defenses similar to Milford's in two previous free speech cases, *Lamb's Chapel* and *Widmar.* In particular, in *Lamb's Chapel,* we explained that "[t]he showing of th[e] film series would not have been during school hours, would not have been sponsored by the school, and would have been open to the public, not just to church members." 508 U. S., at 395. Accordingly, we found that "there would have been no realistic danger that the community would think that the District was endorsing religion or any particular creed." *Ibid.* Likewise, in *Widmar,* where the university's forum was already available to other groups, this Court concluded that there was no Establishment Clause problem. 454 U. S., at 272–273, and n. 13.

The Establishment Clause defense fares no better in this case. As in *Lamb's Chapel,* the Club's meetings were held after school hours, not sponsored by the school, and open to any student who obtained parental consent, not just to Club members. As in *Widmar,* Milford made its forum available to other organizations. The Club's activities are materially indistinguishable from those in *Lamb's Chapel* and *Widmar.* Thus, Milford's reliance on the Establishment Clause is unavailing.

Milford attempts to distinguish *Lamb's Chapel* and *Widmar* by emphasizing that Milford's policy involves elementary school children. According to Milford, children will perceive that the school is endorsing the Club and will feel coercive pressure to participate, because the Club's activities

take place on school grounds, even though they occur during nonschool hours.[5] This argument is unpersuasive.

First, we have held that "a significant factor in upholding governmental programs in the face of Establishment Clause attack is their *neutrality* towards religion." *Rosenberger*, 515 U. S., at 839 (emphasis added). See also *Mitchell v. Helms*, 530 U. S. 793, 809 (2000) (plurality opinion) ("In distinguishing between indoctrination that is attributable to the State and indoctrination that is not, [the Court has] consistently turned to the principle of *neutrality*, upholding aid that is offered to a broad range of groups or persons without regard to their religion" (emphasis added)); *id.*, at 838 (O'CONNOR, J., concurring in judgment) ("[N]eutrality is an important reason for upholding government-aid programs against Establishment Clause challenges"). Milford's implication that granting access to the Club would do damage to the neutrality principle defies logic. For the "guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Rosenberger, supra*, at 839. The Good News Club seeks nothing more than to be treated neutrally and given access to speak about the same topics as are other groups. Because allowing the Club to speak on school grounds would ensure neutrality, not threaten it, Milford faces an uphill battle in arguing that the Establishment Clause compels it to exclude the Good News Club.

---

[5] It is worth noting that, although Milford repeatedly has argued that the Club's meeting time directly after the schoolday is relevant to its Establishment Clause concerns, the record does not reflect any offer by the school district to permit the Club to use the facilities at a different time of day. The superintendent's stated reason for denying the applications was simply that the Club's activities were "religious instruction." 202 F. 3d, at 507. In any event, consistent with *Lamb's Chapel* and *Widmar*, the school could not deny equal access to the Club for any time that is generally available for public use.

Second, to the extent we consider whether the community would feel coercive pressure to engage in the Club's activities, cf. *Lee* v. *Weisman,* 505 U. S. 577, 592–593 (1992), the relevant community would be the parents, not the elementary school children. It is the parents who choose whether their children will attend the Good News Club meetings. Because the children cannot attend without their parents' permission, they cannot be coerced into engaging in the Good News Club's religious activities. Milford does not suggest that the parents of elementary school children would be confused about whether the school was endorsing religion. Nor do we believe that such an argument could be reasonably advanced.

Third, whatever significance we may have assigned in the Establishment Clause context to the suggestion that elementary school children are more impressionable than adults, cf., *e. g., id.,* at 592; *School Dist. of Grand Rapids* v. *Ball,* 473 U. S. 373, 390 (1985) (stating that "symbolism of a union between church and state is most likely to influence children of tender years, whose experience is limited and whose beliefs consequently are the function of environment as much as of free and voluntary choice"), we have never extended our Establishment Clause jurisprudence to foreclose private religious conduct during nonschool hours merely because it takes place on school premises where elementary school children may be present.

None of the cases discussed by Milford persuades us that our Establishment Clause jurisprudence has gone this far. For example, Milford cites *Lee* v. *Weisman* for the proposition that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools," 505 U. S., at 592. In *Lee,* however, we concluded that attendance at the graduation exercise was obligatory. *Id.,* at 586. See also *Santa Fe Independent School Dist.* v. *Doe,* 530 U. S. 290 (2000) (holding the school's policy of permitting prayer at

football games unconstitutional where the activity took place during a school-sponsored event and not in a public forum). We did not place independent significance on the fact that the graduation exercise might take place on school premises, *Lee, supra,* at 583. Here, where the school facilities are being used for a nonschool function and there is no government sponsorship of the Club's activities, *Lee* is inapposite.

Equally unsupportive is *Edwards* v. *Aguillard,* 482 U.S. 578 (1987), in which we held that a Louisiana law that proscribed the teaching of evolution as part of the public school curriculum, unless accompanied by a lesson on creationism, violated the Establishment Clause. In *Edwards,* we mentioned that students are susceptible to pressure in the classroom, particularly given their possible reliance on teachers as role models. See *id.,* at 584. But we did not discuss this concern in our application of the law to the facts. Moreover, we did note that mandatory attendance requirements meant that state advancement of religion in a school would be particularly harshly felt by impressionable students.[6] But we did not suggest that, when the school was not actually advancing religion, the impressionability of students would be relevant to the Establishment Clause issue. Even if *Edwards* had articulated the principle Milford believes it did, the facts in *Edwards* are simply too remote from those here

---

[6] Milford also cites *Illinois ex rel. McCollum* v. *Board of Ed. of School Dist. No. 71, Champaign Cty.,* 333 U.S. 203 (1948), for its position that the Club's religious element would be advanced by the State through compulsory attendance laws. In *McCollum,* the school district excused students from their normal classroom study during the regular schoolday to attend classes taught by sectarian religious teachers, who were subject to approval by the school superintendent. Under these circumstances, this Court found it relevant that "[t]he operation of the State's compulsory education system . . . assist[ed] and [wa]s integrated with the program of religious instruction carried on by separate religious sects." *Id.,* at 209. In the present case, there is simply no integration and cooperation between the school district and the Club. The Club's activities take place *after* the time when the children are compelled by state law to be at the school.

to give the principle any weight. *Edwards* involved the content of the curriculum taught by state teachers *during the schoolday* to children required to attend. Obviously, when individuals who are not schoolteachers are giving lessons after school to children permitted to attend only with parental consent, the concerns expressed in *Edwards* are not present.[7]

Fourth, even if we were to consider the possible misperceptions by schoolchildren in deciding whether Milford's permitting the Club's activities would violate the Establishment Clause, the facts of this case simply do not support Milford's conclusion. There is no evidence that young children are permitted to loiter outside classrooms after the schoolday has ended. Surely even young children are aware of events for which their parents must sign permission

---

[7] Milford also refers to *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens*, 496 U. S. 226 (1990), to support its view that "assumptions about the ability of students to make . . . subtle distinctions [between schoolteachers during the schoolday and Reverend Fournier after school] are less valid for elementary age children who tend to be less informed, more impressionable, and more subject to peer pressure than average adults." Brief for Respondent 19. Four Justices in *Mergens* believed that high school students likely are capable of distinguishing between government and private endorsement of religion. See 496 U. S., at 250–251 (opinion of O'CONNOR, J.). The opinion, however, made no statement about how capable of discerning endorsement elementary school children would have been in the context of *Mergens*, where the activity at issue was *after school*. In any event, even to the extent elementary school children are more prone to peer pressure than are older children, it simply is not clear what, in this case, they could be pressured to do.

In further support of the argument that the impressionability of elementary school children even after school is significant, Milford points to several cases in which we have found Establishment Clause violations in public schools. For example, Milford relies heavily on *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203 (1963), in which we found unconstitutional Pennsylvania's practice of permitting public schools to read Bible verses at the opening of each schoolday. *Schempp*, however, is inapposite because this case does not involve activity by the school during the schoolday.

forms. The meetings were held in a combined high school resource room and middle school special education room, not in an elementary school classroom. The instructors are not schoolteachers. And the children in the group are not all the same age as in the normal classroom setting; their ages range from 6 to 12.[8] In sum, these circumstances simply do not support the theory that small children would perceive endorsement here.

Finally, even if we were to inquire into the minds of school-children in this case, we cannot say the danger that children would misperceive the endorsement of religion is any greater than the danger that they would perceive a hostility toward the religious viewpoint if the Club were excluded from the public forum. This concern is particularly acute given the reality that Milford's building is not used only for elementary school children. Students, from kindergarten through the 12th grade, all attend school in the same building. There may be as many, if not more, upperclassmen as elementary school children who occupy the school after hours. For that matter, members of the public writ large are permitted in the school after hours pursuant to the community use policy. Any bystander could conceivably be aware of the school's use policy and its exclusion of the Good News Club, and could suffer as much from viewpoint discrimination as elementary school children could suffer from perceived endorsement. Cf. *Rosenberger*, 515 U. S., at 835–836 (expressing the concern that viewpoint discrimination can chill individual thought and expression).

---

[8] Milford also relies on the Equal Access Act, 98 Stat. 1302, 20 U. S. C. §§ 4071–4074, as evidence that Congress has recognized the vulnerability of elementary school children to misperceiving endorsement of religion. The Act, however, makes no express recognition of the impressionability of elementary school children. It applies only to public secondary schools and makes no mention of elementary schools. § 4071(a). We can derive no meaning from the choice by Congress not to address elementary schools.

We cannot operate, as Milford would have us do, under the assumption that any risk that small children would perceive endorsement should counsel in favor of excluding the Club's religious activity. We decline to employ Establishment Clause jurisprudence using a modified heckler's veto, in which a group's religious activity can be proscribed on the basis of what the youngest members of the audience might misperceive. Cf. *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515 U. S. 753, 779–780 (1995) (O'CONNOR, J., concurring in part and concurring in judgment) ("[B]ecause our concern is with the political community writ large, the endorsement inquiry is *not about the perceptions of particular individuals* or saving isolated nonadherents from . . . discomfort . . . . It is for this reason that the reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the religious [speech takes place]" (emphasis added)). There are countervailing constitutional concerns related to rights of other individuals in the community. In this case, those countervailing concerns are the free speech rights of the Club and its members. Cf. *Rosenberger, supra,* at 835 ("Vital First Amendment speech principles are at stake here"). And, we have already found that those rights have been violated, not merely perceived to have been violated, by the school's actions toward the Club.

We are not convinced that there is any significance in this case to the possibility that elementary school children may witness the Good News Club's activities on school premises, and therefore we can find no reason to depart from our holdings in *Lamb's Chapel* and *Widmar*. Accordingly, we conclude that permitting the Club to meet on the school's premises would not have violated the Establishment Clause.[9]

---

[9] Both parties have briefed the Establishment Clause issue extensively, and neither suggests that a remand would be of assistance on this issue. Although JUSTICE SOUTER would prefer that a record be developed on

## V

When Milford denied the Good News Club access to the school's limited public forum on the ground that the Club was religious in nature, it discriminated against the Club because of its religious viewpoint in violation of the Free Speech Clause of the First Amendment. Because Milford has not raised a valid Establishment Clause claim, we do not address the question whether such a claim could excuse Milford's viewpoint discrimination.

\* \* \*

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, concurring.

I join the Court's opinion but write separately to explain further my views on two issues.

## I

First, I join Part IV of the Court's opinion, regarding the Establishment Clause issue, with the understanding that its consideration of coercive pressure, see *ante,* at 115, and perceptions of endorsement, see *ante,* at 115, 117–118, "to the extent" that the law makes such factors relevant,

---

several facts, see *post,* at 140, and JUSTICE BREYER believes that development of those facts could yet be dispositive in this case, see *post,* at 128 (opinion concurring in part), none of these facts is relevant to the Establishment Clause inquiry. For example, JUSTICE SOUTER suggests that we cannot determine whether there would be an Establishment Clause violation unless we know when, and to what extent, other groups use the facilities. When a limited public forum is available for use by groups presenting any viewpoint, however, we would not find an Establishment Clause violation simply because only groups presenting a religious viewpoint have opted to take advantage of the forum at a particular time.

is consistent with the belief (which I hold) that in this case that extent is zero. As to coercive pressure: Physical coercion is not at issue here; and so-called "peer pressure," if it can even be considered coercion, is, when it arises from private activities, one of the attendant consequences of a freedom of association that is constitutionally protected, see, *e. g., Roberts* v. *United States Jaycees*, 468 U. S. 609, 622 (1984); *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 460–461 (1958). What is at play here is not coercion, but the compulsion of ideas—and the private right to exert and receive that compulsion (or to have one's children receive it) is *protected* by the Free Speech and Free Exercise Clauses, see, *e. g., Heffron* v. *International Soc. for Krishna Consciousness, Inc.*, 452 U. S. 640, 647 (1981); *Murdock* v. *Pennsylvania*, 319 U. S. 105, 108–109 (1943); *Cantwell* v. *Connecticut*, 310 U. S. 296, 307–310 (1940), not banned by the Establishment Clause. A priest has as much liberty to proselytize as a patriot.

As to endorsement, I have previously written that "[r]eligious expression cannot violate the Establishment Clause where it (1) is purely private and (2) occurs in a traditional or designated public forum, publicly announced and open to all on equal terms." *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515 U. S. 753, 770 (1995). The same is true of private speech that occurs in a limited public forum, publicly announced, whose boundaries are not drawn to favor religious groups but instead permit a cross-section of uses. In that context, which is this case, "erroneous conclusions [about endorsement] do not count." *Id.*, at 765. See also *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384, 401 (1993) (SCALIA, J., concurring in judgment) ("I would hold, simply and clearly, that giving [a private religious group] nondiscriminatory access to school facilities cannot violate [the Establishment Clause] because it does not signify state or local embrace of a particular religious sect").

## II

Second, since we have rejected the only reason that respondent gave for excluding the Club's speech from a forum that clearly included it (the forum was opened to any "us[e] pertaining to the welfare of the community," App. to Pet. for Cert. D1), I do not suppose it matters whether the exclusion is characterized as viewpoint or subject-matter discrimination. Lacking *any* legitimate reason for excluding the Club's speech from its forum—"because it's religious" will not do, see, *e. g., Church of Lukumi Babalu Aye, Inc.* v. *Hialeah,* 508 U. S. 520, 532–533, 546 (1993); *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S. 872, 877–878 (1990)—respondent would seem to fail First Amendment scrutiny regardless of how its action is characterized. Even subject-matter limits must at least be "reasonable in light of the purpose served by the forum," *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.,* 473 U. S. 788, 806 (1985).[1] But I agree, in any event, that respondent did discriminate on the basis of viewpoint.

As I understand it, the point of disagreement between the Court and the dissenters (and the Court of Appeals)

---

[1] In this regard, I should note the inaccuracy of JUSTICE SOUTER's claim that the reasonableness of the forum limitation is not properly before us, see *post,* at 136, and n. 1 (dissenting opinion). Petitioners argued, both in their papers filed in the District Court, Memorandum of Law in Support of Cross-Motion for Summary Judgment in No. 97–CV–0302 (NDNY), pp. 20–22, and in their brief filed on appeal, Brief for Appellants in No. 98–9494 (CA2), pp. 33–35, that respondent's exclusion of them from the forum was unreasonable in light of the purposes served by the forum. Although the District Court did say in passing that the reasonableness of respondent's general restriction on use of its facilities for religious purposes was not challenged, see 21 F. Supp. 2d 147, 154 (NDNY 1998), the Court of Appeals apparently decided that the particular reasonableness challenge brought by petitioners had been preserved, because it addressed the argument on the merits, see 202 F. 3d 502, 509 (CA2 2000) ("Taking first the reasonableness criterion, the Club argues that the restriction is unreasonable . . . . This argument is foreclosed by precedent").

with regard to petitioner's Free Speech Clause claim is not whether the Good News Club must be permitted to present religious viewpoints on morals and character in respondent's forum, which has been opened to secular discussions of that subject, see *ante,* at 108.[2] The answer to that is established by our decision in *Lamb's Chapel, supra.* The point of disagreement is not even whether *some* of the Club's religious speech fell within the protection of *Lamb's Chapel.* It certainly did. See *ante,* at 108; 202 F. 3d 502, 509 (CA2 2000) (the Club's "teachings may involve secular values such as obedience or resisting jealousy").

The disagreement, rather, regards the portions of the Club's meetings that are not "purely" "discussions" of morality and character from a religious viewpoint. The Club, for example, urges children "who already believe in the Lord Jesus as their Savior" to "[s]top and ask God for the strength and the 'want' . . . to obey Him," 21 F. Supp. 2d 147, 156 (NDNY 1998) (internal quotation marks omitted), and it invites children who "don't know Jesus as Savior" to "trust the Lord Jesus to be [their] Savior from sin," *ibid.* The dissenters and the Second Circuit say that the presence of such additional speech, because it is purely religious, transforms the Club's meetings into something different in kind from other, nonreligious activities that teach moral and character development. See *post,* at 132–133 (STEVENS, J., dissenting); *post,* at 137–138 (SOUTER, J., dissenting); 202 F. 3d, at 509–511. Therefore, the argument goes, excluding the Club is not viewpoint discrimination. I disagree.

Respondent has opened its facilities to any "us[e] pertaining to the welfare of the community, provided that such us[e] shall be nonexclusive and shall be opened to the general

---

[2] Neither does the disagreement center on the mode of the Club's speech—the fact that it sings songs and plays games. Although a forum could perhaps be opened to lectures but not plays, debates but not concerts, respondent has placed no such restrictions on the use of its facilities. See App. N8, N14, N19 (allowing seminars, concerts, and plays).

public." App. to Pet. for Cert. D1. Shaping the moral and character development of children certainly "pertain[s] to the welfare of the community." Thus, respondent has agreed that groups engaged in the endeavor of developing character may use its forum. The Boy Scouts, for example, may seek "to influence a boy's character, development and spiritual growth," App. N10–N11; cf. *Boy Scouts of America* v. *Dale*, 530 U. S. 640, 649 (2000) ("[T]he general mission of the Boy Scouts is clear: '[t]o instill values in young people' " (quoting the Scouts' mission statement)), and a group may use Aesop's Fables to teach moral values, App. N11. When the Club attempted to teach Biblical-based moral values, however, it was excluded because its activities "d[id] not involve merely a religious perspective on the secular subject of morality" and because "it [was] clear from the conduct of the meetings that the Good News Club goes far beyond merely stating its viewpoint." 202 F. 3d, at 510.

From no other group does respondent require the sterility of speech that it demands of petitioners. The Boy Scouts could undoubtedly buttress their exhortations to keep "morally straight" and live "clean" lives, see *Boy Scouts of America* v. *Dale, supra,* at 649, by giving *reasons* why that is a good idea—because parents want and expect it, because it will make the scouts "better" and "more successful" people, because it will emulate such admired past Scouts as former President Gerald Ford. The Club, however, may only discuss morals and character, and cannot give *its* reasons why they should be fostered—because God wants and expects it, because it will make the Club members "saintly" people, and because it emulates Jesus Christ. The Club may not, in other words, independently discuss the religious premise on which its views are based—that God exists and His assistance is necessary to morality. It may not defend the premise, and it absolutely must not seek to persuade the children that the premise is true. The children must, so to say, take it on faith. This is blatant viewpoint dis-

crimination. Just as calls to character based on patriotism will go unanswered if the listeners do not believe their country is good and just, calls to moral behavior based on God's will are useless if the listeners do not believe that God exists. Effectiveness in presenting a viewpoint rests on the persuasiveness with which the speaker defends his premise—and in respondent's facilities every premise but a religious one may be defended.

In *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995), we struck down a similar viewpoint restriction. There, a private student newspaper sought funding from a student-activity fund on the same basis as its secular counterparts. And though the paper printed such directly religious material as exhortations to belief, see *id.*, at 826 (quoting the paper's self-described mission "'to encourage students to consider what a personal relationship with Jesus Christ means'"); *id.*, at 865 (SOUTER, J., dissenting) ("'The only way to salvation through Him is by confessing and repenting of sin. It is the Christian's duty to make sinners aware of their need for salvation'" (quoting the paper)); see also *id.*, at 865–867 (quoting other examples), we held that refusing to provide the funds discriminated on the basis of viewpoint, because the religious speech had been used to "provid[e] . . . a specific premise . . . from which a variety of subjects may be discussed and considered," *id.*, at 831 (opinion of the Court). The right to present a viewpoint based on a religion premise carried with it the right to defend the premise.

The dissenters emphasize that the religious speech used by the Club as the foundation for its views on morals and character is not just any type of religious speech—although they cannot agree exactly what type of religious speech it is. In JUSTICE STEVENS's view, it is speech "aimed principally at proselytizing or inculcating belief in a particular religious faith," *post*, at 130; see also *post*, at 133–134, n. 3. This does not, to begin with, distinguish *Rosenberger*, which

also involved proselytizing speech, as the above quotations show. See also *Rosenberger, supra,* at 844 (referring approvingly to the dissent's description of the paper as a "wor[k] characterized by . . . evangelism"). But in addition, it does not distinguish the Club's activities from those of the other groups using respondent's forum—which have not, as JUSTICE STEVENS suggests, see *post,* at 131–132, been restricted to roundtable "discussions" of moral issues. Those groups may seek to inculcate children with their beliefs, and they may furthermore "recruit others to join their respective groups," *post,* at 131. The Club must therefore have liberty to do the same, even if, as JUSTICE STEVENS fears without support in the record, see *ibid.,* its actions may prove (shudder!) divisive. See *Lamb's Chapel,* 508 U. S., at 395 (remarking that worries about "public unrest" caused by "proselytizing" are "difficult to defend as a reason to deny the presentation of a religious point of view"); cf. *Lynch* v. *Donnelly,* 465 U. S. 668, 684–685 (1984) (holding that "political divisiveness" could not invalidate inclusion of crèche in municipal Christmas display); *Cantwell* v. *Connecticut,* 310 U. S., at 310–311.

JUSTICE SOUTER, while agreeing that the Club's religious speech "may be characterized as proselytizing," *post,* at 139, n. 3, thinks that it is even more clearly excludable from respondent's forum because it is essentially "an evangelical service of worship," *post,* at 138. But we have previously rejected the attempt to distinguish worship from other religious speech, saying that "the distinction has [no] intelligible content," and further, no *"relevance"* to the constitutional issue. *Widmar* v. *Vincent,* 454 U. S. 263, 269, n. 6 (1981); see also *Murdock* v. *Pennsylvania,* 319 U. S., at 109 (refusing to distinguish evangelism from worship).[3] Those holdings

---

[3] We *have* drawn a different distinction—between religious speech generally and speech about religion—but only with regard to restrictions the State must place on its own speech, where pervasive state monitoring is unproblematic. See *School Dist. of Abington Township* v. *Schempp,*

are surely proved correct today by the dissenters' inability to agree, even between themselves, into which subcategory of religious speech the Club's activities fell. If the distinction did have content, it would be beyond the courts' competence to administer. *Widmar* v. *Vincent, supra,* at 269, n. 6; cf. *Lee* v. *Weisman,* 505 U. S. 577, 616–617 (1992) (SOUTER, J., concurring) ("I can hardly imagine a subject less amenable to the competence of the federal judiciary, or more deliberately to be avoided where possible," than "comparative theology"). And if courts (and other government officials) were competent, applying the distinction would require state monitoring of private, religious speech with a degree of pervasiveness that we have previously found unacceptable. See, *e. g., Rosenberger* v. *Rector and Visitors of Univ. of Va., supra,* at 844–845; *Widmar* v. *Vincent, supra,* at 269, n. 6. I will not endorse an approach that suffers such a wondrous diversity of flaws.

\* \* \*

With these words of explanation, I join the opinion of the Court.

JUSTICE BREYER, concurring in part.

I agree with the Court's conclusion and join its opinion to the extent that they are consistent with the following three observations. First, the government's "neutrality" in respect to religion is one, but only one, of the considerations relevant to deciding whether a public school's policy violates the Establishment Clause. See, *e. g., Mitchell* v. *Helms,* 530 U. S. 793, 839 (2000) (O'CONNOR, J., concurring in judgment);

---

374 U. S. 203, 225 (1963) (State schools in their official capacity may not teach religion but may teach about religion). Whatever the rule there, licensing and monitoring private religious speech is an entirely different matter, see, *e. g., Kunz* v. *New York,* 340 U. S. 290, 293–294 (1951), even in a limited public forum where the State has some authority to draw subject-matter distinctions.

*Capitol Square Review and Advisory Bd.* v. *Pinette,* 515 U. S. 753, 774, 777 (1995) (O'CONNOR, J., concurring in part and concurring in judgment). As this Court previously has indicated, a child's perception that the school has endorsed a particular religion or religion in general may also prove critically important. See *School Dist. of Grand Rapids* v. *Ball,* 473 U. S. 373, 389–390 (1985); see also *Lamb's Chapel* v. *Center Moriches Union Free School Dist.,* 508 U. S. 384, 395 (1993); *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573, 592–594 (1989). Today's opinion does not purport to change that legal principle.

Second, the critical Establishment Clause question here may well prove to be whether a child, participating in the Good News Club's activities, could reasonably perceive the school's permission for the Club to use its facilities as an endorsement of religion. See *Ball, supra,* at 390 ("[A]n important concern of the effects test is whether . . . the challenged government action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices"). The time of day, the age of the children, the nature of the meetings, and other specific circumstances are relevant in helping to determine whether, in fact, the Club "so dominate[s]" the "forum" that, in the children's minds, "a formal policy of equal access is transformed into a demonstration of approval." *Capitol Square Review and Advisory Bd., supra,* at 777 (O'CONNOR, J., concurring in part and concurring in judgment).

Third, the Court cannot fully answer the Establishment Clause question this case raises, given its procedural posture. The specific legal action that brought this case to the Court of Appeals was the District Court's decision to grant Milford Central School's motion for summary judgment. The Court of Appeals affirmed the grant of summary judgment. We now hold that the school was not entitled to

summary judgment, either in respect to the Free Speech or the Establishment Clause issue. Our holding must mean that, *viewing the disputed facts* (including facts about the children's perceptions) *favorably to the Club* (the nonmoving party), the school has not shown an Establishment Clause violation.

To deny one party's motion for summary judgment, however, is not to grant summary judgment for the other side. There may be disputed "genuine issue[s]" of "material fact," Fed. Rule Civ. Proc. 56(c), particularly about how a reasonable child participant would understand the school's role, cf. *post*, at 140 (SOUTER, J., dissenting). Indeed, the Court itself points to facts not in evidence, *ante*, at 117 ("There is no evidence that young children are permitted to loiter outside classrooms after the schoolday has ended"), *ante*, at 118 ("There may be as many, if not more, upperclassmen as elementary school children who occupy the school after hours"), identifies facts in evidence which may, depending on other facts not in evidence, be of legal significance, *ibid.* (discussing the type of room in which the meetings were held and noting that the Club's participants "are not all the same age as in the normal classroom setting"), and makes assumptions about other facts, *ante*, at 117–118 ("Surely even young children are aware of events for which their parents must sign permission forms"), *ante*, at 118 ("Any bystander could conceivably be aware of the school's use policy and its exclusion of the Good News Club, and could suffer as much from viewpoint discrimination as elementary school children could suffer from perceived endorsement"). The Court's invocation of what is missing from the record and its assumptions about what is present in the record only confirm that both parties, if they so desire, should have a fair opportunity to fill the evidentiary gap in light of today's opinion. Cf. Fed. Rules Civ. Proc. 56(c) (summary judgment appropriate only where there is "no genuine issue as to any material fact" and movant "is entitled to a judgment as a

matter of law"), 56(f) (permitting supplementation of record for summary judgment purposes where appropriate).

JUSTICE STEVENS, dissenting.

The Milford Central School has invited the public to use its facilities for educational and recreational purposes, but not for "religious purposes." Speech for "religious purposes" may reasonably be understood to encompass three different categories. First, there is religious speech that is simply speech about a particular topic from a religious point of view. The film in *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384 (1993), illustrates this category. See *id.*, at 388 (observing that the film series at issue in that case "would discuss Dr. [James] Dobson's views on the undermining influences of the media that could only be counterbalanced by returning to traditional, Christian family values instilled at an early stage"). Second, there is religious speech that amounts to worship, or its equivalent. Our decision in *Widmar* v. *Vincent*, 454 U. S. 263 (1981), concerned such speech. See *id.*, at 264–265 (describing the speech in question as involving "religious worship"). Third, there is an intermediate category that is aimed principally at proselytizing or inculcating belief in a particular religious faith.

A public entity may not generally exclude even religious worship from an open public forum. *Id.*, at 276. Similarly, a public entity that creates a limited public forum for the discussion of certain specified topics may not exclude a speaker simply because she approaches those topics from a religious point of view. Thus, in *Lamb's Chapel* we held that a public school that permitted its facilities to be used for the discussion of family issues and child rearing could not deny access to speakers presenting a religious point of view on those issues. See 508 U. S., at 393–394.

But, while a public entity may not censor speech about an authorized topic based on the point of view expressed

by the speaker, it has broad discretion to "preserve the property under its control for the use to which it is lawfully dedicated." *Greer* v. *Spock*, 424 U. S. 828, 836 (1976); see also *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens*, 496 U. S. 226, 275, n. 6 (1990) (STEVENS, J., dissenting) ("A school's extracurricular activities constitute a part of the school's teaching mission, and the school accordingly must make 'decisions concerning the content of those activities'" (quoting *Widmar*, 454 U. S., at 278 (STEVENS, J., concurring in judgment)). Accordingly, "control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 806 (1985). The novel question that this case presents concerns the constitutionality of a public school's attempt to limit the scope of a public forum it has created. More specifically, the question is whether a school can, consistently with the First Amendment, create a limited public forum that admits the first type of religious speech without allowing the other two.

Distinguishing speech from a religious viewpoint, on the one hand, from religious proselytizing, on the other, is comparable to distinguishing meetings to discuss political issues from meetings whose principal purpose is to recruit new members to join a political organization. If a school decides to authorize afterschool discussions of current events in its classrooms, it may not exclude people from expressing their views simply because it dislikes their particular political opinions. But must it therefore allow organized political groups—for example, the Democratic Party, the Libertarian Party, or the Ku Klux Klan—to hold meetings, the principal purpose of which is not to discuss the current-events topic from their own unique point of view but rather to recruit others to join their respective groups? I think not. Such recruiting meetings may introduce divisiveness and

tend to separate young children into cliques that undermine the school's educational mission. Cf. *Lehman* v. *Shaker Heights,* 418 U. S. 298 (1974) (upholding a city's refusal to allow "political advertising" on public transportation).

School officials may reasonably believe that evangelical meetings designed to convert children to a particular religious faith pose the same risk. And, just as a school may allow meetings to discuss current events from a political perspective without also allowing organized political recruitment, so too can a school allow discussion of topics such as moral development from a religious (or nonreligious) perspective without thereby opening its forum to religious proselytizing or worship. See, *e. g., Campbell* v. *St. Tammany Parish School Board,* 231 F. 3d 937, 942 (CA5 2000) ("Under the Supreme Court's jurisprudence, a government entity such as a school board has the opportunity to open its facilities to activity protected by the First Amendment, without inviting political or religious activities presented in a form that would disserve its efforts to maintain neutrality"). Moreover, any doubt on a question such as this should be resolved in a way that minimizes "intrusion by the Federal Government into the operation of our public schools," *Mergens,* 496 U. S., at 290 (STEVENS, J., dissenting); see also *Epperson* v. *Arkansas,* 393 U. S. 97, 104 (1968) ("Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. . . . By and large, public education in our Nation is committed to the control of state and local authorities").

The particular limitation of the forum at issue in this case is one that prohibits the use of the school's facilities for "religious purposes." It is clear that, by "religious purposes," the school district did not intend to exclude all speech from a religious point of view. See App. N13–N15 (testimony of the superintendent for Milford schools indicating that the policy would permit people to teach "that man was created by God as described in the Book of Genesis" and that crime

was caused by society's "lack of faith in God"). Instead, it sought only to exclude religious speech whose principal goal is to "promote the gospel." *Id.,* at N18. In other words, the school sought to allow the first type of religious speech while excluding the second and third types. As long as this is done in an evenhanded manner, I see no constitutional violation in such an effort.[1] The line between the various categories of religious speech may be difficult to draw, but I think that the distinctions are valid, and that a school, particularly an elementary school, must be permitted to draw them.[2] Cf. *Illinois ex rel. McCollum* v. *Board of Ed. of School Dist. No. 71, Champaign Cty.,* 333 U. S. 203, 231 (1948) (Frankfurter, J., concurring) ("In no activity of the State is it more vital to keep out divisive forces than in its schools . . .").

This case is undoubtedly close. Nonetheless, regardless of whether the Good News Club's activities amount to "worship," it does seem clear, based on the facts in the record, that the school district correctly classified those activities as falling within the third category of religious speech and therefore beyond the scope of the school's limited public forum.[3] In short, I am persuaded that the school district

---

[1] The school district, for example, could not, consistently with its present policy, allow school facilities to be used by a group that affirmatively attempted to inculcate nonbelief in God or in the view that morality is wholly unrelated to belief in God. Nothing in the record, however, indicates that any such group was allowed to use school facilities.

[2] "A perceptive observer sees a material difference between the light of day and the dark of night, and knows that difference to be a reality even though the two are separated not by a bright line but by a zone of twilight." *Buirkle* v. *Hanover Ins. Cos.,* 832 F. Supp. 469, 483 (Mass. 1993).

[3] The majority elides the distinction between religious speech on a particular topic and religious speech that seeks primarily to inculcate belief. Thus, it relies on *Rosenberger* v. *Rector and Visitors of Univ. of Va.,* 515 U. S. 819 (1995), as if that case involved precisely the same type of speech that is at issue here. But, while both Wide Awake, the organization in *Rosenberger,* and the Good News Club engage in a mixture

could (and did) permissibly exclude from its limited public forum proselytizing religious speech that does not rise to the level of actual worship. I would therefore affirm the judgment of the Court of Appeals.

Even if I agreed with Part II of the majority opinion, however, I would not reach out, as it does in Part IV, to decide a constitutional question that was not addressed by either the District Court or the Court of Appeals.

Accordingly, I respectfully dissent.

JUSTICE SOUTER, with whom JUSTICE GINSBURG joins, dissenting.

The majority rules on two issues. First, it decides that the Court of Appeals failed to apply the rule in *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384 (1993), which held that the government may not discriminate on the basis of viewpoint in operating a limited public forum. The majority applies that rule and concludes that Milford violated *Lamb's Chapel* in denying Good News the use of the school. The majority then goes on to determine that it would not violate the Establishment Clause of the First Amendment for the Milford School District to allow the Good News Club to hold its intended gatherings of public school children in Milford's elementary school.

---

of different types of religious speech, the *Rosenberger* Court clearly believed that the first type of religious speech predominated in Wide Awake. It described that group's publications as follows:

"The first issue had articles about racism, crisis pregnancy, stress, prayer, C. S. Lewis' ideas about evil and free will, and reviews of religious music. In the next two issues, Wide Awake featured stories about homosexuality, Christian missionary work, and eating disorders, as well as music reviews and interviews with University professors." *Id.*, at 826.

In contrast to Wide Awake's emphasis on providing Christian commentary on such a diverse array of topics, Good News Club meetings are dominated by religious exhortation, see *post*, at 137–138 (SOUTER, J., dissenting). My position is therefore consistent with the Court's decision in *Rosenberger*.

The majority is mistaken on both points. The Court of Appeals unmistakably distinguished this case from *Lamb's Chapel*, though not by name, and accordingly affirmed the application of a policy, unchallenged in the District Court, that Milford's public schools may not be used for religious purposes. As for the applicability of the Establishment Clause to the Good News Club's intended use of Milford's school, the majority commits error even in reaching the issue, which was addressed neither by the Court of Appeals nor by the District Court. I respectfully dissent.

## I

*Lamb's Chapel*, a case that arose (as this one does) from application of N. Y. Educ. Law § 414 (McKinney 2000) and local policy implementing it, built on the accepted rule that a government body may designate a public forum subject to a reasonable limitation on the scope of permitted subject matter and activity, so long as the government does not use the forum-defining restrictions to deny expression to a particular viewpoint on subjects open to discussion. Specifically, *Lamb's Chapel* held that the government could not "permit school property to be used for the presentation of all views about family issues and child rearing except those dealing with the subject matter from a religious standpoint." 508 U. S., at 393–394.

This case, like *Lamb's Chapel*, properly raises no issue about the reasonableness of Milford's criteria for restricting the scope of its designated public forum. Milford has opened school property for, among other things, "instruction in any branch of education, learning or the arts" and for "social, civic and recreational meetings and entertainment events and other uses pertaining to the welfare of the community, provided that such uses shall be nonexclusive and shall be opened to the general public." App. to Pet. for Cert. D1–D3. But Milford has done this subject to the restriction that "[s]chool premises shall not be used . . . for

religious purposes." *Id.*, at D2. As the District Court stated, Good News did "not object to the reasonableness of [Milford]'s policy that prohibits the use of [its] facilities for religious purposes." *Id.*, at C14.

The sole question before the District Court was, therefore, whether, in refusing to allow Good News's intended use, Milford was misapplying its unchallenged restriction in a way that amounted to imposing a viewpoint-based restriction on what could be said or done by a group entitled to use the forum for an educational, civic, or other permitted purpose. The question was whether Good News was being disqualified when it merely sought to use the school property the same way that the Milford Boy and Girl Scouts and the 4–H Club did. The District Court held on the basis of undisputed facts that Good News's activity was essentially unlike the presentation of views on secular issues from a religious standpoint held to be protected in *Lamb's Chapel*, see App. to Pet. for Cert. C29–C31, and was instead activity precluded by Milford's unchallenged policy against religious use, even under the narrowest definition of that term.

The Court of Appeals understood the issue the same way. See 202 F. 3d 502, 508 (CA2 2000) (Good News argues that "to exclude the Club because it teaches morals and values from a Christian perspective constitutes unconstitutional viewpoint discrimination"); *id.*, at 509 ("The crux of the Good News Club's argument is that the Milford school's application of the Community Use Policy to exclude the Club from its facilities is not viewpoint neutral").[1] The Court of Appeals

---

[1] The Court of Appeals held that any challenge to the policy's reasonableness was foreclosed by its own precedent, 202 F. 3d, at 509, a holding the majority leaves untouched, see *ante*, at 107 ("[W]e need not decide whether it is unreasonable in light of the purposes served by the forum"); cf. *ante*, at 108, n. 2 ("Because we hold that the exclusion of the Club on the basis of its religious perspective constitutes unconstitutional viewpoint discrimination, it is no defense for Milford that purely religious purposes can be excluded under state law"). In any event, the reasonableness of the forum limitation was beyond the scope of the appeal from summary

also realized that the *Lamb's Chapel* criterion was the appropriate measure: "The activities of the Good News Club do not involve merely a religious perspective on the secular subject of morality." 202 F. 3d, at 510. Cf. *Lamb's Chapel, supra,* at 393 (district could not exclude "religious standpoint" in discussion on child rearing and family values, an undisputed "use for social or civic purposes otherwise permitted" under the use policy).[2] The appeals court agreed with the District Court that the undisputed facts in this case differ from those in *Lamb's Chapel,* as night from day. A sampling of those facts shows why both courts were correct.

Good News's classes open and close with prayer. In a sample lesson considered by the District Court, children are instructed that "[t]he Bible tells us how we can have our sins forgiven by receiving the Lord Jesus Christ. It tells us how to live to please Him. . . . If you have received the Lord Jesus as your Saviour from sin, you belong to God's special group—His family." App. to Pet. for Cert. C17–C18 (ellipsis in original). The lesson plan instructs the teacher to "lead a child to Christ," and, when reading a Bible verse, to "[e]mphasize that this verse is from the Bible, God's Word," and is "important—and true—because God said it." The lesson further exhorts the teacher to "[b]e sure to give an opportunity for the 'unsaved' children in your class to respond to the Gospel" and cautions against "neglect[ing] this responsibility." *Id.,* at C20.

While Good News's program utilizes songs and games, the heart of the meeting is the "challenge" and "invitation," which are repeated at various times throughout the lesson.

---

judgment since the District Court had said explicitly that the religious use limitation was not challenged.

[2] It is true, as the majority notes, *ante,* at 109, n. 3, that the Court of Appeals did not cite *Lamb's Chapel* by name. But it followed it in substance, and it did cite an earlier opinion written by the author of the panel opinion here, *Bronx Household of Faith* v. *Community School Dist. No. 10,* 127 F. 3d 207 (CA2 1997), which discussed *Lamb's Chapel* at length.

During the challenge, "saved" children who "already believe in the Lord Jesus as their Savior" are challenged to "'stop and ask God for the strength and the "want" . . . to obey Him.'" *Ibid.* They are instructed that

> "[i]f you know Jesus as your Savior, you need to place God first in your life. And if you don't know Jesus as Savior and if you would like to, then we will—we will pray with you separately, individually. . . . And the challenge would be, those of you who know Jesus as Savior, you can rely on God's strength to obey Him." *Ibid.*

During the invitation, the teacher "invites" the "unsaved" children "'to trust the Lord Jesus to be your Savior from sin,'" and "'receiv[e] [him] as your Savior from sin.'" *Id.,* at C21. The children are then instructed that

> "[i]f you believe what God's Word says about your sin and how Jesus died and rose again for you, you can have His forever life today. Please bow your heads and close your eyes. If you have never believed on the Lord Jesus as your Savior and would like to do that, please show me by raising your hand. If you raised your hand to show me you want to believe on the Lord Jesus, please meet me so I can show you from God's Word how you can receive His everlasting life." *Ibid.*

It is beyond question that Good News intends to use the public school premises not for the mere discussion of a subject from a particular, Christian point of view, but for an evangelical service of worship calling children to commit themselves in an act of Christian conversion.[3] The majority

---

[3] The majority rejects Milford's contention that Good News's activities fall outside the purview of the limited forum because they constitute "religious worship" on the ground that the Court of Appeals made no such determination regarding the character of the club's program, see *ante,* at 112, n. 4. This distinction is merely semantic, in light of the Court

avoids this reality only by resorting to the bland and general characterization of Good News's activity as "teaching of morals and character, from a religious standpoint." *Ante,* at 109. If the majority's statement ignores reality, as it surely does, then today's holding may be understood only in equally generic terms. Otherwise, indeed, this case would stand for the remarkable proposition that any public school opened for civic meetings must be opened for use as a church, synagogue, or mosque.

## II

I also respectfully dissent from the majority's refusal to remand on all other issues, insisting instead on acting as a court of first instance in reviewing Milford's claim that it would violate the Establishment Clause to grant Good News's application. Milford raised this claim to demonstrate a compelling interest for saying no to Good News, even on the erroneous assumption that *Lamb's Chapel's* public forum analysis would otherwise require Milford to say yes. Whereas the District Court and Court of Appeals resolved this case entirely on the ground that Milford's actions did not offend the First Amendment's Speech Clause, the majority now sees fit to rule on the application of the Establishment Clause, in derogation of this Court's proper role as a court of review. *E. g., National Collegiate Athletic*

---

of Appeals's conclusion that "[i]t is difficult to see how the Club's activities differ materially from the 'religious worship' described" in other case law, 202 F. 3d 502, 510 (CA2 2000), and the record below.

JUSTICE STEVENS distinguishes between proselytizing and worship, *ante,* at 130 (dissenting opinion), and distinguishes each from discussion reflecting a religious point of view. I agree with JUSTICE STEVENS that Good News's activities may be characterized as proselytizing and therefore as outside the purpose of Milford's limited forum, *ante,* at 133. Like the Court of Appeals, I also believe Good News's meetings have elements of worship that put the club's activities further afield of Milford's limited forum policy, the legitimacy of which was unchallenged in the summary judgment proceeding.

*Assn.* v. *Smith,* 525 U. S. 459, 470 (1999) ("[W]e do not decide in the first instance issues not decided below").

The Court's usual insistence on resisting temptations to convert itself into a trial court and on remaining a court of review is not any mere procedural nicety, and my objection to turning us into a district court here does not hinge on a preference for immutable procedural rules. Respect for our role as a reviewing court rests, rather, on recognizing that this Court can often learn a good deal from considering how a district court and a court of appeals have worked their way through a difficult issue. It rests on recognizing that an issue as first conceived may come to be seen differently as a case moves through trial and appeal; we are most likely to contribute something of value if we act with the benefit of whatever refinement may come in the course of litigation. And our customary refusal to become a trial court reflects the simple fact that this Court cannot develop a record as well as a trial court can. If I were a trial judge, for example, I would balk at deciding on summary judgment whether an Establishment Clause violation would occur here without having statements of undisputed facts or uncontradicted affidavits showing, for example, whether Good News conducts its instruction at the same time as school-sponsored extracurricular and athletic activities conducted by school staff and volunteers, see Brief for Respondent 6; whether any other community groups use school facilities immediately after classes end and how many students participate in those groups; and the extent to which Good News, with 28 students in its membership, may "dominate the forum" in a way that heightens the perception of official endorsement, *Rosenberger* v. *Rector and Visitors of Univ. of Va.,* 515 U. S. 819, 851 (1995) (O'CONNOR, J., concurring); see also *Widmar* v. *Vincent,* 454 U. S. 263, 274 (1981). We will never know these facts.

Of course, I am in no better position than the majority to perform an Establishment Clause analysis in the first

instance. Like the majority, I lack the benefit that development in the District Court and Court of Appeals might provide, and like the majority I cannot say for sure how complete the record may be. I can, however, speak to the doubtful underpinnings of the majority's conclusion.

This Court has accepted the independent obligation to obey the Establishment Clause as sufficiently compelling to satisfy strict scrutiny under the First Amendment. See *id.*, at 271 ("[T]he interest of the [government] in complying with its constitutional obligations may be characterized as compelling"); *Lamb's Chapel*, 508 U. S., at 394. Milford's actions would offend the Establishment Clause if they carried the message of endorsing religion under the circumstances, as viewed by a reasonable observer. See *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515 U. S. 753, 777 (1995) (O'CONNOR, J., concurring). The majority concludes that such an endorsement effect is out of the question in Milford's case, because the context here is "materially indistinguishable" from the facts in *Lamb's Chapel* and *Widmar*. *Ante*, at 113. In fact, the majority is in no position to say that, for the principal grounds on which we based our Establishment Clause holdings in those cases are clearly absent here.

In *Widmar*, we held that the Establishment Clause did not bar a religious student group from using a public university's meeting space for worship as well as discussion. As for the reasonable observers who might perceive government endorsement of religion, we pointed out that the forum was used by university students, who "are, of course, young adults," and, as such, "are less impressionable than younger students and should be able to appreciate that the University's policy is one of neutrality toward religion." 454 U. S., at 274, n. 14. To the same effect, we remarked that the "large number of groups meeting on campus" negated "any reasonable inference of University support from the mere fact of a campus meeting place." *Ibid.* Not only was the forum "available to a broad class of nonreligious as

well as religious speakers," but there were, in fact, over 100 recognized student groups at the University, and an "absence of empirical evidence that religious groups [would] dominate [the University's] open forum." *Id.*, at 274–275; see also *id.*, at 274 ("The provision of benefits to so broad a spectrum of groups is an important index of secular effect"). And if all that had not been enough to show that the university-student use would probably create no impression of religious endorsement, we pointed out that the university in that case had issued a student handbook with the explicit disclaimer that "the University's name will not 'be identified in any way with the aims, policies, programs, products, or opinions of any organization or its members.'" *Id.*, at 274, n. 14.

*Lamb's Chapel* involved an evening film series on child rearing open to the general public (and, given the subject matter, directed at an adult audience). See 508 U. S., at 387, 395. There, school property "had repeatedly been used by a wide variety of private organizations," and we could say with some assurance that "[u]nder these circumstances . . . there would have been no realistic danger that the community would think that the District was endorsing religion or any particular creed . . . ." *Id.*, at 395.

What we know about this case looks very little like *Widmar* or *Lamb's Chapel.* The cohort addressed by Good News is not university students with relative maturity, or even high school pupils, but elementary school children as young as six.[4] The Establishment Clause cases have

---

[4] It is certainly correct that parents are required to give permission for their children to attend Good News's classes, see *ante*, at 115 (as parents are often required to do for a host of official school extracurricular activities), and correct that those parents would likely not be confused as to the sponsorship of Good News's classes. But the proper focus of concern in assessing effects includes the elementary school pupils who are invited to meetings, Lodging, Exh. X2, who see peers heading into classrooms for religious instruction as other classes end, and who are addressed by the "challenge" and "invitation."

The fact that there may be no evidence in the record that individual students were confused during the time the Good News Club met on school

consistently recognized the particular impressionability of schoolchildren, see *Edwards* v. *Aguillard*, 482 U. S. 578, 583–584 (1987), and the special protection required for those in the elementary grades in the school forum, see *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 620, n. 69 (1989). We have held the difference between college students and grade school pupils to be a "distinction [that] warrants a difference in constitutional results," *Edwards* v. *Aguillard, supra*, at 584, n. 5 (internal quotation marks and citation omitted).

Nor is Milford's limited forum anything like the sites for wide-ranging intellectual exchange that were home to the challenged activities in *Widmar* and *Lamb's Chapel*. See also *Rosenberger*, 515 U. S., at 850, 836–837. In *Widmar*, the nature of the university campus and the sheer number of activities offered precluded the reasonable college observer from seeing government endorsement in any one of them, and so did the time and variety of community use in the *Lamb's Chapel* case. See also *Rosenberger*, 515 U. S., at 850 ("Given this wide array of nonreligious, antireligious and competing religious viewpoints in the forum supported by the University, any perception that the University endorses one particular viewpoint would be illogical"); *id.*, at 836–837, 850 (emphasizing the array of university-funded magazines containing "widely divergent viewpoints" and the fact that believers in Christian evangelism competed on equal footing in the University forum with aficionados of "Plato, Spinoza, and Descartes," as well as "Karl Marx, Bertrand Russell, and Jean-Paul Sartre"); *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens*, 496

---

premises pursuant to the District Court's preliminary injunction is immaterial, cf. Brief for Petitioners 38. As JUSTICE O'CONNOR explained in *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515 U. S. 753 (1995), the endorsement test does not focus "on the actual perception of individual observers, who naturally have differing degrees of knowledge," but on "the perspective of a hypothetical observer." *Id.*, at 779–780 (opinion concurring in part and concurring in judgment).

U. S. 226, 252 (1990) (plurality opinion) ("To the extent that a religious club is merely one of many different student-initiated voluntary clubs, students should perceive no message of government endorsement of religion").

The timing and format of Good News's gatherings, on the other hand, may well affirmatively suggest the *imprimatur* of officialdom in the minds of the young children. The club is open solely to elementary students (not the entire community, as in *Lamb's Chapel*), only four outside groups have been identified as meeting in the school, and Good News is, seemingly, the only one whose instruction follows immediately on the conclusion of the official schoolday. See Brief for National School Boards Association et al. as *Amici Curiae* 6. Although school is out at 2:56 p.m., Good News apparently requested use of the school beginning at 2:30 on Tuesdays "during the school year," so that instruction could begin promptly at 3:00, see Lodging, Exh. W–1, at which time children who are compelled by law to attend school surely remain in the building. Good News's religious meeting follows regular school activities so closely that the Good News instructor must wait to begin until "the room is clear," and "people are out of the room," App. P29, before starting proceedings in the classroom located next to the regular third- and fourth-grade rooms, *id.*, at N12. In fact, the temporal and physical continuity of Good News's meetings with the regular school routine seems to be the whole point of using the school. When meetings were held in a community church, 8 or 10 children attended; after the school became the site, the number went up three-fold. *Id.*, at P12; Lodging, Exh. AA2.

Even on the summary judgment record, then, a record lacking whatever supplementation the trial process might have led to, and devoid of such insight as the trial and appellate judges might have contributed in addressing the Establishment Clause, we can say this: there is a good case that Good News's exercises blur the line between public

classroom instruction and private religious indoctrination, leaving a reasonable elementary school pupil unable to appreciate that the former instruction is the business of the school while the latter evangelism is not. Thus, the facts we know (or think we know) point away from the majority's conclusion, and while the consolation may be that nothing really gets resolved when the judicial process is so truncated, that is not much to recommend today's result.